884 F.2d 1569
 132 L.R.R.M. (BNA) 3035, 58 USLW 2375,
113 Lab.Cas. P 11,518
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
UNITED TECHNOLOGIES CORPORATION, Respondent,
and
District 91, LAMAW, AFL-CIO, Intervenor.
LODGE 700, INTERNATIONAL ASSOCIATION OF MACHINISTS AND
AEROSPACE WORKERS, AFL-CIO, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
and
United Technologies Corporation, Intervenor.
 Nos. 1095, 1096, Dockets 89-4003, 89-4009.
 United States Court of Appeals,
Second Circuit.
 Argued May 8, 1989.
Decided Sept. 13, 1989.
 
 Edward J. Dempsey, Director, Indus. Relations & Labor Counsel, United Technologies Corp., Hartford, Conn., for respondent/intervenor United Technologies Corp.
 Judith P. Flower, Washington, D.C. (Barbara A. Atkin, Supervisory Attorney, Joseph E. Desio, Acting Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Aileen A. Armstrong, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., of counsel), for petitioner-respondent, N.L.R.B.
 Gregg D. Adler, Hartford, Conn. (Anne Goldstein, Kestell, Pogue & Gould, Hartford, Conn., of counsel), for petitioner, Lodge 700 and Intervenor District 91, Intern. Ass'n of Machinists and Aerospace Workers, AFL-CIO.
 Before KEARSE, CARDAMONE and PIERCE, Circuit Judges.
 CARDAMONE, Circuit Judge:
 
 
 1
 We have before us two cases, Case No. 89-4003 and Case No. 89-4009, from the National Labor Relations Board (NLRB or Board) that have been consolidated for purposes of appeal. We deal with each case separately.
 
 I. Case No. 89-4003
 
 2
 In Case No. 89-4003, the Board petitions for enforcement of its order that found respondent United Technologies Corporation (employer or company) in violation of Secs. 8(a)(1) and 8(a)(5) of the National Labor Relations Act (NLRA or Act), 29 U.S.C. Secs. 158(a)(1) and 158(a)(5) (1982), for having failed to include production control coordinators in the certified and agreed upon bargaining unit. Respondent cross-petitions for review.
 
 PRIOR PROCEEDINGS
 
 3
 United Technologies manufactures aircraft engines and parts at North Haven, East Hartford, Middletown, and Southington, Connecticut. Each facility has its own collective bargaining agreement with the same bargaining unit that includes
 
 
 4
 [A]ll production and maintenance employees ... including inspectors, crib attendants, material handlers, factory clerks and working leaders, but excluding ... salaried office and clerical employees, ... foremen, assistant foremen, group supervisors ... and all other supervisory employees with authority to hire, promote, discharge, discipline or otherwise effect changes in the status of employees....
 
 
 5
 The Middletown bargaining unit includes "plant clerical employees" as well. Each collective bargaining agreement contains the following Management Functions Clause
 
 
 6
 It is recognized that in addition to other functions and responsibilities, the company has and will retain the sole right and responsibility to direct the operations of the company and in this connection to determine the number and location of its plants; the product to be manufactured; the types of work to be performed; the assignment of all work to employees or other persons; the schedules of production; shift schedules and hours of work; the methods, processes and means of manufacturing; and to select, hire, and demote employees, including the right to make and apply rules and regulations for production, discipline, efficiency, and safety.
 
 
 7
 Prior to the subject dispute, the company employed "expediters", union-covered employees, who were responsible for ensuring that certain parts critical in the manufacturing process were always available. This involved the expediters in moving around the plant, following parts to their necessary destination. They also kept an inventory of the parts for which they were responsible by counting them. Expediters' duties included investigating delays, allocating parts where needed and where shortages were likely to occur. In performing these tasks the expediters exercised their judgment. In addition to time on the floor, some time was spent behind a desk and at a computer terminal, compiling daily status reports of parts on the shortage list. They reported to plant foremen and were directed in their activities by "working leader" expediters. As of July, 1982 there were about 235 expediters spread in unequal numbers throughout the company's four facilities.
 
 
 8
 The employer also employed "production inventory clerks" (inventory clerks) who were salaried, non-union employees. Their function was to prepare reports, control records and chart the flow of parts on a large scale. Typically, inventory clerks worked at computer terminals tracking the allocation of parts within specific departments. There were 76 of them at the four facilities.
 
 
 9
 This system of production and inventory control was imperfect. For example, inventory-clerk-generated information was often a day old and unreliable. Needing up-to-the-minute rather than stale information, the company in 1982 set in motion a plan to change the system by creating "production control coordinators" (control coordinators) the characterization of whose duties is the sole subject of the dispute in 89-4003. Creation of the control coordinators effectively reduced and mostly eliminated the jobs of union expediters and non-union inventory clerks. According to the company, by late fall 1983, 77 expediters and 58 inventory clerks had become control coordinators. The company admits that it is phasing out expediters and replacing them with the new positions that it considers salaried non-union employees. The employer's refusal to recognize the union as the control coordinators' bargaining representative is what precipitated the instant litigation.
 
 
 10
 A rough description of control coordinators' duties is that they are a modern amalgam of the inventory clerks and the expediters. Like expediters, control coordinators are primarily responsible for ensuring that critical parts are allocated correctly and efficiently. It is their duty to chart the progress of parts throughout the plants. This function is performed principally through the use of computers. Control coordinators only occasionally walk the floors of the plant actually following parts, as the expediters did. They still continue the basic task of physically counting parts that was previously performed by the expediters.
 
 
 11
 Ultimately, grievances were filed by the union. The Board's final decision--issued after its initial petition for enforcement was withdrawn from this Court without prejudice--held that the company's exclusion of the control coordinators from the covered bargaining unit violated Secs. 8(a)(1) and 8(a)(5) of the Act and ordered that they be included in that unit. In so holding, the Board rejected the Administrative Law Judge's (ALJ) analysis--though not necessarily his conclusions as a whole--that the company's decision to implement its new production control system was not a mandatory subject of bargaining and that the company would have to bargain over the effects of its exclusion of control coordinators from the bargaining units. The present petition for enforcement and cross-petition for review followed.
 
 DISCUSSION
 
 12
 United Technologies makes two arguments in its cross-petition. First, it contends that in ruling under Bay Shipbuilding Corp., 263 N.L.R.B. 1133 (1982), enf'd., 721 F.2d 187 (7th Cir.1983), that the company had unlawfully excluded control coordinators from the bargaining unit, the Board failed to undertake the necessary "community of interest" analysis to determine whether or not they should be included. Second, it asserts that even if the Board considered such an interest, there is not substantial evidence that control coordinators and expediters were so similar as to include the former in the bargaining unit. We consider each proposition in turn.
 
 
 13
 Section 8(a)(5) of the NLRA makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees, subject to the provisions of [Section 9(a) ]." 29 U.S.C. Sec. 158(a)(5). Section 9(a) states that
 
 
 14
 Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit [for bargaining] in respect to rates of pay, wages, hours of employment, or other conditions of employment....
 
 
 15
 29 U.S.C. Sec. 159(a). Adherence to a bargaining unit, once it is fixed, is central to Congress' purpose of stabilizing labor-management relations in interstate commerce. See Boise Cascade Corp. v. NLRB, 860 F.2d 471, 475 (D.C.Cir.1988). Thus, once the bargaining unit is established by the collective bargaining agreement or by NLRB action, an employer may not remove a job within the unit without either the approval of the Board or consent by the union.
 
 
 16
 An employer seeking to remove positions from a bargaining unit has the burden of showing sufficient dissimilarity so as to warrant their severance. Bay Shipbuilding Corp., 263 N.L.R.B. at 1140, enf'd., 721 F.2d at 191. Technological change that affects jobs within the unit does not relieve the employer of its duty to bargain. See Bay Shipbuilding Corp., 721 F.2d at 190; Newspaper Printing Corp. v. NLRB, 625 F.2d 956, 964 (10th Cir.1980), cert. denied, 450 U.S. 911, 101 S.Ct. 1349, 67 L.Ed.2d 335 (1981); Metromedia, Inc., KMBC-TV v. NLRB, 586 F.2d 1182, 1192 (8th Cir.1978).
 
 
 17
 In Bay Shipbuilding, for example, the Board held that an employer cannot unilaterally refuse to bargain with a particular group of employees based upon changes in its business operations, unless those changes demonstrate that the group is no longer an appropriate bargaining unit. See 721 F.2d at 189-90. The Seventh Circuit noted that the Board had found that computer lofting employees at issue in that case had an adequate "community of interest" with the established unit of "production and maintenance" employees, which had previously included manual lofting employees. See id. In finding that a production and maintenance unit including computer lofting employees was appropriate, the Board considered factors such as "the similarity of jobs and functions performed by employees, organizational structure, common supervision, and interchange between employees." Id. Upon analysis, these factors suggested that both manual and computer lofting employees required basic education in mathematics, geometry, blueprint reading, and welding. They were under common supervision and interacted substantially with one another. As such, the court found that the Board's determination was supported by substantial evidence. Id. at 191.
 
 
 18
 United Technologies' principal argument is that the Board did not undertake the proper analysis under the community of interest standard. See NLRB v. Magna Corp., 734 F.2d 1057, 1061-62 (5th Cir.1984). The court in Magna declined to enforce a portion of a Board order because the Board "deviated from its established practice in unit clarification proceedings when it failed to apply the 'community of interest' standard." Id. at 1061. It noted that the Board has always used this standard to evaluate "substantially changed" job classifications during unit clarification proceedings. Id. at 1062.
 
 
 19
 The NLRB's counterargument to cross-petitioner's first contention is twofold. It states that a control coordinator is not a "new job" or a "substantially changed" job classification. Rather, the position is merely an updated expediter, one who assumed the totality of the expediter's duties with minor changes attributable to new technology. The differences--such as not physically walking the plant floor and keeping larger and different types of records--are superficial alterations to the same job. Accordingly, when the new position was created and the expediter phased out, the new work title simply stood in the shoes of the old expediter title in the bargaining unit.
 
 
 20
 The Board further claims that it undertakes "formal community of interest analysis" only when an employer creates a new job without eliminating or phasing out a previous unit-encompassed position. Here, the Board adopted that portion of the ALJ's opinion that rejected the employer's asserted differences between the expediters and the control coordinators. Thus, it was not necessary for it to engage in protracted analysis of the community of interest between the former and the latter because it had already determined that the company had not carried its burden to demonstrate dissimilarity.
 
 
 21
 To United Technologies' second argument--that there is not substantial evidence in the record that control coordinators and expediters were so similar as to include the former in the bargaining unit--it is sufficient to say that the record reveals substantial evidence to support the ALJ's and the Board's findings that the two positions were sufficiently similar for the new position to be included in the bargaining unit. The company had the burden to show that dissimilarities outweighed similarities so as to justify removal of the newly-created positions from the unit. In making such showing, the employer could have pointed to a number of factors, for example, dissimilarities in the scale of wages, employment benefits, hours of work and other conditions of employment, in addition to dissimilarities in the type of work performed and the responsibilities of the specific job. Here the record demonstrates, and the Board held, that whatever differences between the two positions existed were solely the result of technological change. We may not substitute our judgment for that of the Board, even though had the matter been before us de novo a different choice might reasonably have been made. See Universal Camera Corp. v. NLRB, 340 U.S. 474, 488, 71 S.Ct. 456, 464-65, 95 L.Ed. 456 (1951).
 
 
 22
 Hence, the petition of the Board for enforcement of its order should be granted and the company's cross-petition for review should be denied.
 
 II. Case No. 89-4009
 
 23
 In Case No. 89-4009, Lodge 700 of the International Association of Machinists (Lodge 700) petitions for review of an order and decision of the Board, reversing the decision of an ALJ, which concluded that United Technologies Corporation did not violate Secs. 8(a)(1) and 8(a)(5) of the Act when it altered its system of progressive discipline at its Middletown, Connecticut facility.
 
 FACTS
 
 24
 Lodge 700 represents the employees at United Technologies' Middletown, Connecticut facility. Under the company's progressive discipline policy, employees with attendance and absenteeism problems were progressively disciplined with a verbal warning, a written warning, a 3- or 5-day suspension and, finally, discharge. The testimony before the ALJ indicates that of the 71 employees discharged for attendance problems from 1980 to June 1983, 67 had first been suspended. In June 1983, the company issued the following statement at its Middletown facility
 
 
 25
 In applying progressive disciplinary action in cases involving poor attendance, we have used a pattern of verbal warning, written warning, suspension and, finally, dismissal.
 
 
 26
 The imposition of additional time off from the job in the form of a suspension ... is counterproductive. Effective immediately, any individual who received a final warning and who fails to improve or maintain an attendance record satisfactory to supervision will be dismissed.
 
 
 27
 In other words, the 3- or 5-day suspension portion of the progressive discipline scheme was eliminated.
 
 
 28
 The union requested that the company bargain over this term of employment. The company refused and stated that the Management Functions Clause in its 1982 collective bargaining agreement relieved the company from its duty to bargain under Sec. 8(a)(5). The Management Functions Clause states that
 
 
 29
 [i]t is recognized that in addition to other functions and responsibilities, the company has and will retain the sole right and responsibility to direct the operations of the company and in this connection to determine the number and location of its plants; the product to be manufactured; the types of work to be performed; the assignment of all work to employees or other persons; the schedules of production; shift schedules and hours of work; the methods, processes and means of manufacturing; and to select, hire, and demote employees, including the right to make and apply rules and regulations for production, discipline, efficiency, and safety.
 
 
 30
 It shall also have the right and responsibility to discharge or otherwise discipline any employee for just cause, to promote and transfer, and to lay off because of lack of work or other cause, unless otherwise hereinafter provided.
 
 
 31
 In its letter refusing to bargain, the employer interpreted the second paragraph of the clause as permitting it to alter the "method" of disciplining and dismissing employees.
 
 
 32
 Thus, though all parties agreed that disciplinary rules are mandatory subjects of bargaining under Sec. 8(a)(5) of the Act, the Board argues that the union waived its right to bargain on this issue under the language of the above-recited Management Functions Clause. The ALJ found no waiver. In reversing that determination, the Board ruled that the union had agreed to a Management Functions Clause that "plainly grant[ed] the [company] the right to unilaterally make and apply rules for discipline," and that extrinsic evidence did not indicate that the clause meant anything other than what it said. The union's petition for review followed.
 
 DISCUSSION
 
 33
 It is axiomatic that an employer violates its duty to bargain under Sec. 8(a)(5) of the Act by changing employees' terms and conditions of employment without notifying and bargaining with the collective bargaining representative of its employees. See NLRB v. Katz, 369 U.S. 736, 743, 82 S.Ct. 1107, 1111, 8 L.Ed.2d 230 (1962). Further, it is agreed that the imposition of new attendance or absenteeism rules for which employees may be disciplined is a change in terms and conditions of employment over which an employer is required to bargain. See Ciba-Geigy Pharmaceuticals Div. v. NLRB, 722 F.2d 1120, 1126-27 (3rd Cir.1983) (employer violated Act by unilaterally implementing new attendance control procedure); Electri-Flex Co. v. NLRB, 570 F.2d 1327, 1336 (7th Cir.), cert. denied, 439 U.S. 911, 99 S.Ct. 280, 58 L.Ed.2d 256 (1978).
 
 
 34
 It is equally clear that a union may waive its statutory right to bargain over a particular term or condition of employment. See NLRB v. C & C Plywood Corp., 385 U.S. 421, 430-31, 87 S.Ct. 559, 565, 17 L.Ed.2d 486 (1967); NLRB v. Island Typographers, Inc., 705 F.2d 44, 48 (2d Cir.1983). Because "national labor policy disfavors waivers of statutory rights by unions," Chesapeake & Potomac Telephone Co. v. NLRB, 687 F.2d 633, 636 (2d Cir.1982), the purported waiver "must be clear and unmistakable." Metropolitan Edison Co. v. NLRB, 460 U.S. 693, 708, 103 S.Ct. 1467, 1477, 75 L.Ed.2d 387 (1983). Such waiver may be found in an express provision in the parties' collective bargaining agreement, or by the conduct of the parties, including their past practices and bargaining history, or by a combination of the two. Chesapeake & Potomac, 687 F.2d at 636; see also American Distrib. Co. v. NLRB, 715 F.2d 446, 450 (9th Cir.1983) (same), cert. denied, 466 U.S. 958, 104 S.Ct. 2170, 80 L.Ed.2d 553 (1984). Bargaining history and past practices--if taken alone--may establish waiver of a mandatory bargaining subject when the matter was thoroughly aired in past negotiations and the union "consciously yielded" its rights in the matter. See American Distrib. Co., 715 F.2d at 450. An employer relying on a claim of waiver of a duty to bargain bears the burden of demonstrating it clearly and unmistakably. See NLRB v. Challenge-Cook Bros. of Ohio, Inc., 843 F.2d 230, 233 (6th Cir.1988).
 
 
 35
 Whether a party has waived its right to bargain is a question within the Board's specialized expertise and factfinding authority. See American Distrib. Co., 715 F.2d at 450. Because of the Board's expertise in labor matters, we give due deference to its reasonable interpretations of collective bargaining agreements, and the Board's finding that a party has waived a right should be enforced where supported by substantial evidence. See Beth Israel Hospital v. NLRB, 437 U.S. 483, 501, 98 S.Ct. 2463, 2473, 57 L.Ed.2d 370 (1978); NLRB v. Truck Drivers Local Union No. 449, 728 F.2d 80, 84 (2d Cir.1984).
 
 
 36
 A. Language of the Management Functions Clause
 
 
 37
 It is well settled that contract clauses should be interpreted "based on their plain and literal meaning so as to avoid interference with the private bargain." See NLRB v. South Central Bell Tel. Co., 688 F.2d 345, 353 (5th Cir.1982), cert. denied, 460 U.S. 1081, 103 S.Ct. 1768, 76 L.Ed.2d 342 (1983). Here, the Board determined that the language of the Management Functions Clause granted the company the unilateral right to make changes in its progressive system of discipline for absenteeism, particularly by the provision stating that the company "has and will retain the sole right and responsibility to direct the operations of the company ... including the right to make and apply rules and regulations for production, discipline, efficiency, and safety." The second paragraph of that Clause adds that the company has the right "to discharge or otherwise discipline any employee for just cause." Taken together this language plainly grants United Technologies broad authority to make disciplinary rules and impose discipline leading up to and including discharge for good cause.
 
 
 38
 The union responds that the reference in the Management Functions Clause to the company's right to make rules for discipline is not sufficiently explicit to constitute a waiver because it does not mention "discharge." This argument takes one phrase in the Management Functions Clause and reads it too literally. The right to discipline implicitly includes the right to discharge. The union also argues that even assuming that the plain language of the Clause could be construed as a waiver, it granted the company only the right to make "new" rules, which the union distinguishes from rules modifying the past practices of the parties. The Board reasonably rejected this attempted distinction, and we agree with its finding that a purported difference between making and changing rules is simply semantical.
 
 B. Extrinsic Evidence
 
 39
 The union's next contention is that even assuming that a waiver could be ascertained from the contract language, the extrinsic evidence shows that the union did not intend to waive its right to bargain. See Local Union 1395, IBEW v. NLRB, 797 F.2d 1027, 1036 & n. 9 (D.C.Cir.1986) (extrinsic evidence must be considered even where contractual language is clear). Specifically, the union points to its filing of unfair labor practice charges in 1977 to protest United Technologies' unilateral change in its disciplinary rules. In order to settle the charges, the company agreed to bargain over the changes. This prior filing of charges, the union claims, is evidence of the fact that it never intended to waive its right to bargain over changes in the company's disciplinary rules. We disagree.
 
 
 40
 In Local Union 1395, IBEW v. NLRB, 797 F.2d 1027 (D.C.Cir.1986) (Indianapolis Power & Light ), the court agreed with the Board that the broad language of a no-strike provision suggested a waiver of the union's right to engage in a sympathy strike. Id. at 1034-35. The court, nonetheless, remanded the case to the Board to consider extensive evidence developed during contract negotiations, concerning the parties' interpretation of the no-strike clause. Id. at 1036-37. Upon remand, the Board found no waiver, on the ground that "the bargaining history evidences an agreement to disagree over the scope of the no-strike clause." But see Oil, Chemical & Atomic Workers International Union, Local 1-547 v. NLRB, 842 F.2d 1141, 1144 (9th Cir.1988) (extrinsic evidence considered only because "plain language" of contract was unclear).
 
 
 41
 Absent evidence of any linkage between the 1977 incident and the 1982 negotiations, the Board reasonably found that the mere fact that the company agreed to forego a right on a single occasion five years before entering the collective bargaining agreement does not constitute sufficient evidence to negate the language used by the parties in that agreement. A contracting party may have any number of different reasons for agreeing to settle an unfair labor practice charge and to agree to bargain over a disputed subject. Whether the Board was or was not required to do so, it here considered the cited extrinsic evidence, but found that the company's failure to exercise its contractual right on a single occasion and the subsequent negotiations were insufficient to establish that the parties "agreed to disagree" regarding express language contained in the collective bargaining agreement. Hence, it is plain that the Management Functions Clause was not intended to mean anything other than what it says. The language of that clause cannot be cast in a light in legal proceedings that permits the union to recoup a right it has bargained away. Accordingly, the order of the Board is affirmed.
 
 CONCLUSION
 
 42
 In Case No. 89-4003, enforcement of the Board's order is granted and the cross-petition denied.
 
 
 43
 In Case No. 89-4009, the Board's order is affirmed, the petition for review is denied.