McDONNELL DOUGLAS CORPO-
RATION, and its Related Divi-
sions, Petitioners,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 94–1300.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 3, 1995.

Decided July 18, 1995.

James N. Adler, Los Angeles, CA, argued the cause, for petitioners. With him on the briefs was Thomas V. Reichert, Los Angeles, CA.

David S. Habenstreit, Atty., N.L.R.B., Washington, DC, argued the cause, for respondent. With him on the brief were Aileen A. Armstrong, Deputy Associate Gen. Counsel, Frederick L. Feinstein, Gen. Counsel, and Linda R. Sher, Acting Associate Gen. Counsel, N.L.R.B., Washington, DC. Peter D. Winkler, Supervisory Atty., N.L.R.B., Washington, DC, entered an appearance.

Before: STEPHEN F. WILLIAMS, HENDERSON and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.

STEPHEN F. WILLIAMS, Circuit Judge:

After transferring certain employees from one corporate division to another, McDonnell Douglas reclassified them out of a bargaining unit represented by Southern California Professional Engineering Association ("SCPEA" or the "union"), invoking its 1987 collective bargaining agreement and later elaborations of the agreement as support for both the procedure and the substance of the decision. The union charged the company with committing an unfair labor practice in the form of unilaterally altering the scope of a bargaining unit. The company defended on two grounds, *either* of which—the company and the National Labor Relations Board both agree—would be a complete defense. The company's first defense was that it had acted with union consent, by virtue of the collective bargaining agreement and its later refinements. Its alternative defense was that the reclassification was consistent with national labor law standards governing the proper scope of a bargaining unit.

The administrative law judge hearing the case found the reclassification issue well suited to resolution through the grievance and arbitration procedures established by the parties' collective bargaining agreement and declined to adjudicate the merits of the charge. On the union's petition, the Board reversed, explaining that the case could not be deferred to arbitration because it presented a "representation issue", which, it said, is a kind of issue that cannot be settled in arbitration. On the merits, the Board found an unfair labor practice, concluding that the union had not consented to the employees' removal from the unit and rejecting the company's alternative defense that the reclassification was proper under the labor laws. *McDonnell Douglas Corporation*, 312 NLRB 373, 1993 WL 382085 (1993), *reh'g denied*, 313 NLRB 868, 1994 WL 66790 (1994). McDonnell Douglas now petitions for review of the Board's decision, and the Board cross-applies for enforcement.

Although the Board has discretion to choose whether to defer to arbitration, it has purported to exercise that discretion consistent with a policy, viz., it defers to arbitration in cases in which the contract settles the issue. In explaining its decision not to defer here, however, it cited no decision in which a party's contractual consent could potentially have been dispositive but instead invoked ones where extra-contractual principles or interests were plainly at stake. We find its explanation for departing from its general policy of deferring to arbitration wholly inscrutable. Accordingly, we remand the case to the Board for it to reconsider the issue of deferral to arbitration, and we do not reach the merits of the unfair labor practice charge.

\* \* \*

The facts are not in dispute. SCPEA represented more than 6000 McDonnell Douglas employees under a single collective bargaining agreement covering the period from 1987 to 1990. Before the transfer, the 32 engineers at issue here were employees of a division known as McDonnell Douglas Aerospace Information Services Company ("Information Services"). Among its other functions, Information Services "leased" pools of computer and engineering professionals to other McDonnell Douglas divisions. These 32 were leased to McDonnell Douglas Astronautics Company—Huntington Beach ("Astronautics"), where they worked side by side with Astronautics engineers developing embedded system software. Their work was essentially identical to that of their Astronautics counterparts, except that they reported ultimately to Information Services administrative supervisors, and their compensation, discipline, and career paths were set by Information Services.

During late 1988, the company decided to decentralize its operations. As part of the reorganization, it divided Astronautics by function into two new divisions, McDonnell Douglas Space Systems Company and McDonnell Douglas Electronic Systems Company ("Electronic Systems"); it also dissolved the Information Services labor pools and reassigned those workers to work directly for the divisions to which they had been leased. The function the 32 engineers had been performing was now handled by Electronic Systems. Thus, as part of the reorganization, the 32 (along with their former Astronautics counterparts) were transferred to Electronic Systems. While they continued doing the same work they had been doing for Astronautics as Information Services employees, they began, along with their former Astronautics counterparts (who were non-unit employees), reporting only to Electronic Systems supervisors. At this point, McDonnell Douglas reclassified the 32 as outside the unit.

The union did not object to the engineers' transfer to Electronic Systems but vigorously opposed their reclassification, complaining to the NLRB that by ceasing to recognize the union as these employees' representative the company had unilaterally altered the scope of the unit in violation of §§ 8(a)(5) and (1) of the National Labor Relations Act. See 29 U.S.C. §§ 158(a)(5), (a)(1); *Int'l Union of Elec., Radio & Mach. Workers, AFL–CIO– CLC v. NLRB,* 604 F.2d 689, 696 & n. 21 (D.C.Cir.1979) (unit scope is a "permissive" subject of bargaining; therefore, employer who refuses to bargain with appropriate unit violates §§ 8(a)(1) and (5) of the NLRA). In defense, the company insisted that it had not altered the scope of the unit at all; it had simply, consistently with its rights under the 1987 collective bargaining agreement and later elaborations, transferred these employees (among numerous others) to a new division and classified them consistently with their new positions in light of those agreements. Cf. *NLRB v. Greensburg Coca–Cola Bottling Co., Inc.,* 40 F.3d 669 (3d Cir.1994) (holding

that company, by insisting that bargaining agreement's recognition clause did not extend to part-time employees, had not "attempt[ed] to alter the bargaining unit but rather merely advanced its interpretation of the contractual language" and noting that "interpretation of the scope of the recognition clause" could be resolved in arbitration).

The 1987 collective bargaining agreement set forth the parties' understanding of the scope of the union's representation,[1] defining it by reference in part to the company's component divisions, in part to the type of work being done. Before the reorganization, all Information Services computer engineers, regardless of the type of work they did, had been classified as unit employees; employees of Astronautics, on the other hand, had been classified as unit or non-unit depending on the kind of work they did. Of course, disputes about the application of the classification scheme to particular work or particular employees had occasionally arisen. In October 1988 the union and the company had settled one such dispute by means of an ancillary agreement, which the parties refer to as the "Embedded System Software Agreement" or "ESSA". Among other things, the ESSA stated that from then on Astronautics employees who worked in specified phases of embedded systems software development would be classified as non-unit employees.

McDonnell Douglas defends its decision to reclassify the 32 engineers on several grounds, all but the last of which rely on various agreements with the union. First, it maintains that the classification of the 32 former Information Services engineers is governed by the ESSA and that the 32 work in the phases of the software development process that the ESSA specifies as non-unit. While it agrees that the ESSA's classification scheme did not apply to the 32 when they worked for Information Services (and that, at that time, the 32 were properly classified under the 1987 CBA as unit employees), it contends that once the 32 workers' affiliation

1. In the agreement's recognition clause, the company agreed to recognize the union as the exclusive representative of (1) employees in classifications certified by the Board, (2) employees in

classifications set forth in the appendix to the agreement, and (3) other employees as mutually agreed upon.

was switched from Information Services to Electronic Systems, the successor of Astronautics, they were subject by default to the ESSA and thus became non-unit employees.

Second, it points to the collective bargaining agreement, especially to Article II, in which the union agreed that the company would have the "exclusive" right to "transfer, classify, reclassify ... employees" except insofar as "specifically prohibited" by the agreement, and which establishes the grievance procedure. See also Art. IX § 6 (allowing company to place new jobs into effect in event that union and company are unable to reach agreement). The company thus claims it was entitled by contract to make the initial decision to reclassify these employees, that it made this decision in compliance with both the 1987 agreement and the ESSA, and that, if the union believes the company's classification is in error, its remedy is to contest the company's decision through the collective bargaining agreement's grievance and arbitration procedures.

Third, it says that if its right initially to reclassify the 32 had not already been clear under the 1987 agreement and ESSA, it became so when, during 1990 negotiations over a new bargaining agreement, the union agreed that any dispute about the classification of the former Information Services employees would be resolved "the way" such disputes had been resolved "in the past." "In the past," the company says, the company made the initial classification decision, subject to the union's right to contest it through grievance and arbitration procedures. Thus, in its view, the parties not only engaged in a practice under the collective bargaining agreement that confirms its understanding, but they also explicitly reconfirmed the suitability of that practice for this very episode. Finally, the company argues that, in any event, its classification of the 32 is consistent with national labor law standards for defining the scope of a bargaining unit.

\* \* \*

■ McDonnell Douglas's threshold contention is that the Board should have deferred the union's unfair labor practice claim to arbitration, since the company's primary defense is that its actions were fully authorized by its agreements with the union, and the collective bargaining agreement provides for arbitration as a means of settling disputes about its meaning.

The Board itself agrees that prior union consent is a complete defense to the unfair labor practice charge. In its decision in this case the Board said: "An employer violates the Act when it removes a substantial group of employees from a bargaining unit, unless it *either* (1) *obtains the agreement of the union to do so,* or (2) is able to establish that the removed group is sufficiently dissimilar from the remainder of the unit to warrant removal." *McDonnell Douglas Corp.,* 312 NLRB at 375, 1993 WL 382085 (emphasis added) (citing, e.g., *United Technologies Corp. v. International Assoc. of Machinists and Aerospace Workers,* 292 NLRB 248, 1989 WL 223764, *enf'd* 884 F.2d 1569, 1572 (2d Cir.1989)); see also *Utility Workers Union v. NLRB,* 39 F.3d 1210, 1215 (D.C.Cir. 1994) ("[W]hen a refusal to bargain claim is answered with a defense of contractual right, the unfair labor practice and the contractual dispute converge."); *NLRB v. United States Postal Service,* 8 F.3d 832, 837 (D.C.Cir.1993) ("[W]here the employer acts pursuant to a claim of right under the parties' agreement, the resolution of the refusal to bargain charge rests on an interpretation of the contract at issue."); *NCR Corp.,* 271 NLRB 1212, 1213, 1984 WL 36730 (1984) (holding that employer did not commit unfair labor practice when it transferred work out of the unit in accordance with its "reasonable" interpretation of the collective bargaining agreement).

■ When presented with an unfair labor practice claim that turns on the interpretation of a contract that provides for arbitration, the Board has statutory *authority* to interpret the contract to resolve the charge, *NLRB v. United States Postal Service,* 8 F.3d 832, 837 (D.C.Cir.1993) (citing *NLRB v. C & C Plywood Corp.,* 385 U.S 421, 427–30, 87 S.Ct. 559, 563–65, 17 L.Ed.2d 486 (1967)), but has *discretion* to refuse to exercise that authority in the first instance and instead defer the claim to the agreed-upon arbitration procedures, *Hammontree v. NLRB,* 925

F.2d 1486 (D.C.Cir.1991) (en banc) (approving, as consistent with NLRA and Labor Management Relations Act, Board's decision to require an employee to exhaust grievance procedures under the collective bargaining agreement before filing an unfair labor practice charge). Like much agency discretion, the discretion whether or not to defer to arbitration must be exercised in a principled manner. See *American Freight Sys., Inc. v. NLRB,* 722 F.2d 828, 832 (D.C.Cir.1983) ("Although the Board has considerable discretion in deciding whether to defer to an arbitration decision, a failure to follow its own standards of deference is an abuse of that discretion."). Here, nothing the Board has yet said suggests that its decision not to defer to the grievance and arbitration mechanism in the parties' collective bargaining agreement is consistent with coherent Board policy.

■ McDonnell Douglas states that the Board's general policy is to defer to arbitration whenever the parties' agreement provides for arbitration, see *Collyer Insulated Wire,* 192 NLRB 837 (1971) (establishing the policy); *United Technologies Corp.,* 268 NLRB 557, 559, 1984 WL 36028 (1984) (reaffirming Board's commitment to *Collyer*); *Hammontree v. NLRB,* 925 F.2d 1486 (D.C.Cir.1991) (approving the policy), a policy adopted "[i]n recognition of both the fact that [the Board] has authority to interpret collective bargaining agreements only in connection with unfair labor practice charges, and the importance of the principle of freedom of contract in labor law". *NLRB v. United States Postal Service,* 8 F.3d at 837. Indeed the Board has a surprisingly marginal role in interpretation of collective bargaining agreements. Because courts are the principal interpreters of contracts, and § 301 of the Labor Management Relations Act directs federal courts to fashion a body of federal law for interpretation of collective bargaining agreements, the courts owe no deference "to the Board in its interpretation" of such an agreement. *Litton Financial Printing Division v. NLRB,* 501 U.S. 190, 201, 111 S.Ct. 2215, 2223, 115 L.Ed.2d 177 (1991). While the Board cheerily concedes the existence of its deference policy, it says the policy has no application here. This case involves a "representation issue", and, it says, representation issues can never be finally resolved by arbitration, so the Board has a consistent practice of *not* deferring cases involving such issues to arbitration. *McDonnell Douglas,* 312 NLRB at 375 n. 5, 1993 WL 382085 ("Representation issues involve the application of basic statutory policy and standards, and are matters for decision *exclusively* by the Board." (quoting *Jayar Metal Corp.,* 297 NLRB 603, 608–09, 1990 WL 122259 (1990)); Respondent's Br. at 27 ("representational issues ... are solely matters of national labor policy, and not of contract interpretation"); cf. *Newspaper Guild v. NLRB,* 636 F.2d 550, 559 (D.C.Cir.1980) ("The Board's policy has been to defer to arbitration where disputes turn on collective bargaining agreements, but not where they rest upon interpretations of the Act itself.").

■ Assuming that the issue in this case is properly called a "representation issue", the Board's categorical statement that "representational issues" are not susceptible to resolution by contract does not square with Board precedent. The Board has never suggested that a union and employer cannot contractually bind each other as to the scope of the bargaining unit. In fact, the Board remarked in this very case that it has a policy of encouraging unions and employers to enter into such agreements. See Respondent's Br. at 33; see also *NLRB v. Lyon & Ryan Ford, Inc.,* 647 F.2d 745, 752 (7th Cir.1981). And McDonnell Douglas points to several cases in which an employer has been compelled, pursuant to a collective bargaining agreement, to arbitrate a dispute about the agreed-upon scope of the bargaining unit. See, e.g., *District 37 of Int'l Ass'n of Machinist & Aerospace Workers v. Lockheed Eng'g & Mgmt. Servs. Co.,* 897 F.2d 768 (5th Cir.1990); *Concourse Village, Inc. v. Local 32E, Service Employees Int'l Union, AFL–CIO,* 822 F.2d 302, 304–05 (2nd Cir.1987); see also *Carey v. Westinghouse Elec. Corp.,* 375 U.S. 261, 272, 84 S.Ct. 401, 409, 11 L.Ed.2d 320 (1964) (holding that union could compel arbitration, stating, "However the dispute be considered—whether one involving work assignment or one concerning representation—we see no barrier to use of the

arbitration procedure."); *Hammontree v. NLRB,* 925 F.2d at 1505 (Edwards, J., concurring) ("[T]he Court has enforced agreements to arbitrate under section 301 of the LMRA even where it might ultimately be determined that the claim involves a matter within the *exclusive* jurisdiction of the Board, *e.g.,* where a claim involves representational rights which presumably may not be waived by contractual agreement.") (citing *Carey* ). Indeed, the assertion that any representation issue is necessarily one for the Board alone is completely inconsistent with the Board's own statement of the substantive rule governing this case—that union consent is a complete defense to the unfair labor practice charge.

Moreover, the cases the Board cites for the proposition that it never defers to arbitration in cases involving a "representation issue" all appear to involve claims that could *only* be decided by reference to standards outside the contract. In *Marion Power Shovel Co.,* 230 NLRB 576, 1977 WL 8821 (1977), an employer was confronted with two unions' conflicting claims to represent the same employees and filed a unit clarification petition with the Board. One of the unions proposed that the issue be deferred to arbitration "under the respective collective-bargaining agreements", *id.* at 577, 1977 WL 8821, though without explaining (so far as the Board's opinion reveals) just how the arbitration would meld the procedures associated with each of the warring unions. The Board declined to defer, explaining that no contract can settle the ultimate issue raised by a unit clarification petition—"what is the appropriate unit or units"—since the Board, as the arbiter of proper unit scope, can override an agreement between the parties. *Id.* Here, by contrast, an authoritative interpretation of the contract may settle the ultimate issue— whether McDonnell Douglas, by reclassifying 32 engineers, altered the scope of the unit *without the union's authorization.* If, as McDonnell Douglas contends, the union agreed in the 1987 contract that the company could initially classify employees, then, under the law as stated by both parties in this case, the company's reclassification of these engineers is not an unfair labor practice even if the classification itself is ultimately rejected by the Board.

The two other cases the Board cites for the categorical proposition that "representation issues" are not deferred to arbitration are *Paper Manufacturers Co.,* 274 NLRB 491, 1985 WL 45820 (1985), *enf'd,* 786 F.2d 163, 166 (3d Cir.1986), and *Jayar Metal Finishing Corp.,* 297 NLRB 603, 1990 WL 122259 (1990). In *Paper Manufacturers,* one union, a Teamsters local, brought an unfair labor practice claim against the employer and a second union, a local of the Graphic Communications International. In resolving a dispute between the Teamsters local and the employer, an arbitrator had held that former Communications employees accreted to the Teamsters bargaining unit. This determination, the Board noted, was based on an assumption—which the Board found erroneous under the labor laws—that the Communications bargaining unit had ceased to exist. The Board saw no reason to defer to the arbitrator's conclusion as to the status of the Communications unit, since that status could not be determined by the agreement between Teamsters and the employer, but only by reference to the national labor laws. It drew the following contrast between contract and national labor law issues:

> With regard to questions of contract coverage, the controlling consideration is the intent of the parties [to the contract]. With regard to the question of the scope of an appropriate bargaining unit, a vital consideration is freedom of choice in selecting a bargaining agent.... Thus, all the arbitrator can decide is that *the employer and union have all agreed* that the union may bargain for a group of employees, *regardless of [the employees'] wishes* in the matter. It is for the Board to decide whether such disenfranchisement is consistent with the policies of the Act.

274 NLRB at 495, 1985 WL 45820 (quoting *Combustion Engineering,* 195 NLRB 909, 910–11, 1972 WL 7355 (1972)) (emphasis added).

Finally, in *Jayar Metal Finishing,* an employee, Rosa Chevere, brought an unfair labor practice claim against her employer for recognizing Local 113, National Organization of Industrial Trade Unions ("NOITU"), as

the representative of herself and other Jayar employees when "NOITU did not have signed authorization cards from a majority of [Jayar] employees". The employer claimed to have acted pursuant to an arbitrator's decision settling a dispute between Local 113, Solidarity of Labor Organizations International Union ("SOLO") and Local 113, NOITU, that clearly awarded the Jayar shop to NOITU. The Board refused even to entertain this defense of contractual right, finding that the arbitrator "did not have jurisdiction to determine the representative status" of the two unions and had essentially "arbitrarily decided which Locals should represent which shops". The Board seems to have concluded that the agreement between the two locals and the employer as to the scope of the various units was itself contrary to the national labor laws—which require authorization by the employees—and thus violated Chevere's rights under §§ 8(a)(1), (2), and (3) of the Act.

In each of the cited cases, the Board correctly notes, the ultimate issue was a matter that could not be decided simply by interpreting the contract: in the first case, because a Board's decision as to the scope of the unit trumps the parties' agreement; in the second case, because one union and an employer cannot by their agreement (or by arbitration pursuant to that agreement) determine the status of a second union; in the third case, because the agreement between the employer and the union itself violated the employee's rights under the national labor laws. In this case, by contrast, the Board seems to concede that the ultimate issue— whether McDonnell Douglas committed an unfair labor practice by reclassifying the 32 engineers as non-unit—can be resolved *solely* by reference to the parties' CBA and ancillary agreements. Thus, this case does not appear in any way to fit the Board's stated rationale for refusing to defer—that the ultimate issue may be resolved *solely* by reference to the national labor laws. We therefore remand the case to the Board. Unless its initial decision not to defer to arbitration was a lawful departure in this case from its general policy of deferring to agreed-upon grievance and arbitration procedures (a matter we cannot definitively review in the ab-

sence of some explanation by the Board, *SEC v. Chenery Corp.*, 318 U.S. 80, 94–95, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1943); *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C.Cir.1970)), we have no occasion to reach the logically dependent issue of whether the Board's interpretation of the contracts is correct.

*So ordered.*