**TERRE HAUTE NEWSPAPER
GUILD, LOCAL NO. 46,**
Plaintiff,

v.

**THOMSON NEWSPAPERS,
INC., Defendant.**

No. TH 97–334 CM/F.

United States District Court,
S.D. Indiana,
Terre Haute Division.

April 23, 1999.

Frederick W. Dennerline, III, Fillenwarth, Dennerline, Growth & Towe, Indianapolis, IN, for plaintiff.

Mark J. Romaniuk, McHale, Cook & Welch, Indianapolis, IN, for defendant.

### ORDER on MOTIONS FOR SUMMARY JUDGMENT

McKINNEY, District Judge.

Both Plaintiff, Terre Haute Newspaper Guild, Local No. 46 (the "Guild"), and Defendant, Thomson Newspapers, Inc. ("Thomson"), have filed motions for summary judgment on the Guild's underlying cause of action requesting that the Court compel arbitration. Pursuant to the Labor Management Relations Act § 301, ("LMRA") 29 U.S.C. § 185(a), the Guild seeks an order requiring that the grievance filed by the Guild on May 23, 1997, be submitted to arbitration. Previously, the Guild requested that the matter be arbitrated, and Thomson refused. Thomson maintains that the grievance is not subject to arbitration under the controlling collective bargaining agreement. The issues have been fully briefed and are ready to be resolved. For the reasons stated herein, the Court now DENIES the Guild's Motion for Summary Judgment and GRANTS Thomson's Motion for Summary Judgment.

### I. FACTUAL & PROCEDURAL BACKGROUND

At the center of this cause of action is a collective bargaining agreement ("CBA") executed by the Guild and the Tribune Star Publishing Company, Inc. ("Star Publishing, Inc.") on August 16, 1995. Plf.'s Ex. 1. Before the Court examines the content of the CBA at issue, it is first helpful to review the history of Star Publishing, Inc. and Thomson, as well as the current structure of Thomson and its divisions. In March of 1990, Lincoln Publishing, Inc. ("Lincoln") purchased the stock of Star Publishing, Inc., which owned and operated the *Terre Haute Tribune–Star* newspaper. Def.'s Resp. to Plf.'s First Set of Interrogs. ("Interrog.") ¶ 4. At that time, Lincoln was a wholly-owned subsidiary of Thomson. *Id.* In June of that same year Star Publishing, Inc. was merged into Terre Haute Newspapers, Inc., a wholly-owned subsidiary of Lincoln. Interrog. ¶ 4. After this merger, Star Publishing, Inc. was administratively dissolved. *Id.* In December of 1993, Terre Haute Newspapers was merged into Lincoln and shortly thereafter, Lincoln was merged into Thomson. *Id.* Accordingly, at all times relevant to this cause of action, Thomson either directly or indirectly owned the *Terre Haute Tribune–Star*, but Thomson maintains that during this time, the *Terre Haute Tribune–Star* operated as an independent enterprise. Interrog. ¶ 4.

Thomson currently has a division known as the Terre Haute Strategic Marketing Group ("SMG"). *Id.* at 2. SMG, in turn, has four independent operating units: the *Linton Daily News–Linton Daily Citizen* (*"Linton"*), the *Terre Haute Tribune–Star* (*"Tribune–Star"*) Niche Publications ("Niche") and Administration. Meany Aff.

¶ 4. Both the *Linton*, capitalized by Thomson in February of 1997, and the *Tribune–Star*, capitalized on March 1, 1990, put out daily newspapers that bear the units' respective names. *Id.* ¶ ¶ 6–7. Niche, capitalized May 1, 1996, produces specialty publications such as shoppers and children's magazines that are published on varying distribution cycles. *Id.;* Meany Dep. at 14–15. The Administration unit provides business services to the remaining three units. Meany Aff. ¶ 5. Both the *Tribune–Star* and Niche operate out of the same building in Terre Haute. Interrog. ¶ 2.

Jack Meany ("Meany"), an employee of Thomson, is the Chief Executive Officer ("CEO") of SMG and the Publisher of the *Tribune–Star*. Meany Dep. at 4–5. In his capacity as CEO, he oversees the production of SMG's operating units. *Id.* at 5–6. Although the heads of the operating units are responsible for the day-to-day activities of the units, the Director of Niche, the Publisher of *Linton*, SMG's chief financial officer and SMG's production director all report directly to Meany. *Id.* at 8; Meany Aff. ¶ 10. As publisher of the *Tribune–Star*, Meany's responsibilities include negotiating collective bargaining agreements with the unions and overseeing the *Tribune–Star*'s day-to-day compliance with those collective bargaining agreements. Meany Dep. at 8–9. Currently, the *Tribune–Star* is involved in five different collective bargaining agreements. One of those is the CBA at issue between Star Publishing, Inc. and the Guild.[1] *See* Plf.'s Ex. 1. Thomson acknowledges that it is the successor in interest to Star Publishing, Inc., asserting that the CBA is between the Guild and the *Tribune–Star*, a unit of

SMG, which is a division of Thomson. Interrog. ¶ 4.

In the first paragraph of the CBA, the parties provide that the CBA involves Star Publishing, Inc. and the Guild "for itself and on behalf of all employees of the Publisher [Star Publishing, Inc.] in the Advertising, Editorial, Circulation, and Business Office departments" and excludes only the employees in those departments who are covered by other collective bargaining agreements and those specifically exempted under the terms of the CBA. Plf.'s Ex. 1 at 1. Article I of the CBA concerns jurisdiction and defines the bargaining unit as such:

> The bargaining unit-(a) The kind of work either normally, or presently, performed within the unit covered by this contract, and new or additional work either (1) assigned to be performed within the said unit, or (2) of the same nature in either skill or function as the kind of work either normally or presently performed in the said unit, is recognized as the jurisdiction of the Guild, and the performance of such work shall be assigned to employees within the Guild's jurisdiction, except jobs which are specifically listed in Section 2 below.[2] ... Performance of work within the jurisdiction of the bargaining unit, whether by presently or normally used processes or equipment, or by new or modified processes or equipment shall be assigned to the employees of the Publisher covered by this contract.

*Id.*, Art. I, sec.1. According to Meany, members of the bargaining unit include those employees who serve as reporters, solicit advertising, work in sales and mar-

---

1. The Court notes that the CBA was entered into by Star Publishing, Inc. in 1995, even though Star Publishing, Inc. had been administratively dissolved in 1990.

2. Section 2 of Article I excludes the following employees and position from coverage under the CBA: Publisher, Confidential Secretary, Editor, Managing Editor, News Editor, Editorial Page Editor, City Editor, Photo/Graphics

Editor, Managing Editor, Controller, Assistant Controller, Credit/Personnel Manager, Advertising Director, Retail Sales Manager, Classified Sales Manager, Classified Inside Manager, Marketing Director, Circulation Director, Circulation Sales Manager, Single Copy Manager, Customer Service Manager, Distribution Manager, Weekend Service Coordinator, Personnel Administrator, Special Projects Manager, General Manager, NIE Co-ordinator.

keting, work in the circulation department and perform bookkeeping for the *Tribune–Star*. Meany Dep. at 12–13, 24–25; Meany Aff. ¶ 19. Under the CBA, the Guild designates a Standing Committee to "take up with the Publisher [Star Publishing, Inc.] any matter arising from the application of this agreement or affecting the relations of the Publisher and the Guild." Plf.'s Ex. 1, Art. V, sec. 1. If the grievance is not resolved within thirty days of its consideration at a meeting held between the Standing Committee and Star Publishing, Inc., the CBA provides that "[a]ll disputes and disagreements arising from the application of this agreement (except for renewal of this contract) . . . may be submitted to final arbitration by the Guild." *Id.*, Art. V, sec. 3.

By means of a letter dated May 23, 1997, and addressed to Meany as "publisher of the Terre Haute *Tribune–Star* and vice president and group publisher of the Terre Haute Strategic Marketing Group (SMG)," the Guild filed an official grievance against Star Publishing, Inc.. Plf.'s Ex. 2. The letter referenced a meeting held on May 9, 1997, between the Guild's Standing Committee and Meany, Patti Minglin, Director of Niche Publications, and Rick Schmidt, the *Tribune–Star* Advertising Director. *Id.* The focus of the meeting was on the Guild's claim that SMG employees who are non-union employees, are doing Guild work in violation of the CBA. *Id.* According to the letter, because the matter was not resolved at the meeting, the Guild felt it necessary to file an official grievance alleging a number of CBA violations. Those violations include not recognizing non-union employees that are doing Guild work and ignoring the CBA's guidelines concerning wages, hours and working conditions for those SMG employees. *Id.* The Guild suggested that the grievance be resolved by recognizing the SMG employees as belonging to the bargaining unit and applying the terms and conditions of the applicable CBA to those employees. The SMG employees at issue in this grievance appear to be those who work for Niche. *See* Plf.'s Mot. for Summ.

J. at 3; Def.'s Resp. and Mot. for Summ. J.; Plf.'s Ex. 3. In a letter from its attorney, the *Tribune–Star* responded to this grievance by refusing to submit the grievance to arbitration. Plf.'s Ex. 3. Asserting that the claim was not arbitrable under the existing CBA, the *Tribune–Star* noted that Niche was not a party to the CBA and therefore any attempt to accrete the Niche employees was unlawful. *Id.* Furthermore, the *Tribune–Star* asserted that it had no authority or responsibility over Niche employees. *Id.*

As previously noted, Niche produces a range of specialty publications with differing distribution cycles. Meany Dep. at 14–15; Meany Aff. ¶ ¶ 6–7. According to Meany, the Niche publications have much narrower markets than does the *Tribune–Star*. Meany Dep. at 14. Niche publications are not distributed in the *Tribune–Star*, but are generally either delivered by mail or placed for pick-up in certain locations. Meany Dep. at 15–16. The distribution areas for the products of the two units also differs. Meany Aff. ¶ 7. When Niche was formed in 1996, employees were specifically hired to work for Niche; these employees did not come to Niche from the *Tribune–Star*. *Id.* ¶ 14. Niche and the *Tribune–Star* do share a building and the two units share some physical space, as advertising and composing employees for the *Tribune–Star* share a room with Niche employees. *Id.* at 20. Additionally, there are people in the CBA bargaining unit that sell advertising for both Niche and the *Tribune–Star*. *Id.* at 25. The printings of Niche publications are bid on the open market, and although the *Tribune–Star* has done printing of Niche publications, it is not Niche's only printer. Meany Aff. ¶ 16. According to the mast head of *Curiosity*, a monthly publication by Niche, six of the seven employees of Niche hold the respective positions of publisher, editor, assistant editor/ graphic designer, illustrator, sales and marketing manager, and sales executive. Meany Dep. at 21–22, 26. The six employees that work on *Curiosity* generally put out the other Niche publica-

tions, though Meany noted that they may not all work on every publication. *Id.* at 26.

## II. STANDARDS

According to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." A genuine issue of material fact exists whenever "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The nonmoving party bears the burden of demonstrating that such a genuine issue of material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Oliver v. Oshkosh Truck Corp.,* 96 F.3d 992, 997 (7th Cir.1996). The mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. Only factual disputes that might affect the outcome of the suit in light of the substantive law will preclude summary judgment. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505; *JPM Inc. v. John Deere Indus. Equip. Co.,* 94 F.3d 270, 273 (7th Cir.1996).

## III. DISCUSSION

### A. SUMMARY OF ARGUMENTS

The Guild maintains that the grievance it filed concerning SMG employees performing bargaining unit work is subject to arbitration under the terms of the CBA. Emphasizing that the grievance arose out of the application of the CBA to those employees, the Guild urges the Court to send the matter to arbitration and to allow the arbitrator to determine whether certain employees and certain work are covered by the terms of the agreement. Thomson contends that the Guild entered into the CBA with the *Tribune–Star,* not

Niche, and that because the *Tribune–Star* and Niche are separate and distinct operating units within Thomson, Niche employees are not subject to the terms of the *Tribune–Star*'s CBA. Furthermore, they argue that the work performed by Niche employees is not similar to the work performed by the *Tribune–Star* bargaining unit employees. In support of this assertion, Thomson points to the different target audiences, distribution plans, distribution areas and compensation systems of the *Tribune–Star* and Niche.

### B. ANALYSIS

 Section 301 of the LMRA provides that "suits for violations of contracts between an employer and a labor organization representing employees in an industry affecting commerce ... may be brought in any district court of the United States having jurisdiction of the parties...." 29 U.S.C. § 185(a). When addressing causes of action brought under § 301 of the LMRA, the Seventh Circuit has reaffirmed general principals provided by the Supreme Court in arbitration cases. *See Local 371 v. Logistics Support Group,* 999 F.2d 227, 228 (7th Cir.1993); *International Ass'n of Machinists, Lodge No. 1000 v. General Electric Co.,* 865 F.2d 902, 903–04 (7th Cir.1989). First, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT & T Technologies, Inc., v. Communications Workers of America,* 475 U.S. 643, 648, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986)(quoting *United Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 582, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960)). Absent some contractual agreement to the contrary, if a party does not agree to arbitrate, it normally has a right to have a court determine the merits of its claim. *First Options of Chicago v. Kaplan,* 514 U.S. 938, 942, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995). Second, when the CBA does contain an arbitration clause, the courts have imposed a presumption in favor of arbitra-

tion to the extent that "[a]n order to arbitrate should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *AT & T Tech.*, 475 U.S. at 650, 106 S.Ct. 1415 (quoting *Warrior & Gulf,* 363 U.S. at 582–83, 80 S.Ct. 1347). Third, the issue of whether the CBA creates a duty to arbitrate is a matter for judicial determination. *Id.* at 649, 80 S.Ct. 1347. However, when determining "whether the parties have agreed to submit a particular grievance to arbitration, a court is not to rule on the potential merits of the underlying claim." *Id.* Parties may agree to arbitrate the arbitrability of a grievance, but courts will not assume this agreement has been made unless there is clear and unmistakable evidence to that effect. *First Options of Chicago,* 514 U.S. at 944, 115 S.Ct. 1920; *Local 744 v. Hinckley & Schmitt, Inc.,* 76 F.3d 162, 165 (7th Cir. 1996).

■ The Seventh Circuit has recognized an underlying tension in certain cases between a court's duty to decide whether a grievance is arbitrable and its duty to not rule on the merits of the grievance. *Independent Lift Truck Builders Union v. Hyster Co.,* 2 F.3d 233, 236 (7th Cir.1993); *see also Hinckley & Schmitt,* 76 F.3d at 165 (citing to *Hyster*). To resolve this tension, the Seventh Circuit looked to the Supreme Court's holding in *Litton Financial Printing v. NLRB,* 501 U.S. 190, 111 S.Ct. 2215, 115 L.Ed.2d 177 (1991), that a court cannot avoid its duty of deciding if the parties agreed to arbitration because such a determination requires the court to interpret a provision of the collective bargaining agreement. *Hyster,* 2 F.3d at 236 (citing *Litton,* 501 U.S. at 190, 111 S.Ct. 2215). In *Hyster,* the court stated "[i]t appears then that the rule that courts must decide arbitrators' jurisdiction takes precedence over the rule that courts are not to decide the merits of the underlying dispute. If the court must, to decide the

arbitrability issue, rule on the merits, so be it." 2 F.3d at 236.

The CBA at issue here does contain an arbitration provision, allowing arbitration for "[a]ll disputes and disagreements arising from the application of this agreement (expect for renewal of this contract)...." Plf.'s Ex. 1, Art. V, sec. 3. Thus, the Court must decide if the Guild's grievance concerning the work done by SMG employees in the Niche unit arises from the application of the CBA. According to the Seventh Circuit's decision in *Hinckley & Schmitt,* when deciding this, the Court must first determine whether the SMG employees that are targeted in the grievance are in fact subject to the CBA. If the employees are not within the jurisdiction of the CBA, then any complaint the Guild has regarding those employees does not arise out of the application of the CBA and the grievance does not have be arbitrated. However, if the SMG employees are subject to the CBA, then concerns regarding these employees and their compliance with the CBA does arise from the application of the CBA and must be arbitrated.

In *Hinckley & Schmitt,* the Union and Hinckley & Schmitt ("Hinckley") entered into a collective bargaining agreement wherein Hinckley was required to recognize the Union as the exclusive bargaining representative for certain employees in designated facilities. 76 F.3d at 163. The agreement applied to listed categories of employees and to "all production and plant employees." *Id.* at 164. The Union filed a grievance alleging that Hinckley was in violation of various provisions of the collective bargaining agreement because non-union workers classified as pallet makers, oil checkers and sanitation workers[3] were performing work covered by the collective bargaining agreement. *Id.* at 163. The pallet makers and oil checkers had been employees of Hinckley for a number of years before this grievance was filed. *Lo-*

---

**3.** Subsequently, the Union conceded that it did not have the position of sanitation worker and therefore proceeded with the grievance only as to the pallet makers and oil checkers. *Hinckley & Schmitt,* 76 F.3d at 163 n. 1.

cal 744 v. Hinckley & Schmitt, Inc., No. 93C7541, 1996 WL 697627 at * 3 (N.D.Ill. Nov.26, 1996). In the grievance the Union demanded that the employees at issue be placed in the bargaining unit and receive rates and benefits specified by the collective bargaining agreement. *Hinckley & Schmitt*, 76 F.3d at 163. Informing the Union that the workers had never been included in the bargaining unit and had different assigned tasks and pay scales than those workers in the unit, Hinckley determined the grievance was inappropriate and refused to submit it to arbitration. *Id.* The Union filed a motion to compel arbitration and the district court granted summary judgment in favor of the Union, ordering arbitration to determine whether the workers at issue were covered by the collective bargaining agreement and therefore part of the bargaining unit. *Id.* at 163.

Acknowledging that under the facts of the case a determination of arbitrability was essentially a determination of the grievance itself, the Seventh Circuit reversed and remanded the lower court's order. The court explained that if the phrase "all production and plant employees" included oil checkers and pallet makers, then the grievance had to be arbitrated and the Union would most likely be successful on its claim. *Id.* at 164. However, if the phrase did not include those two groups of employees, then the agreement and the arbitration clause did not apply. *Id.* After citing to *Litton* and *Hyster*, the court found that in order to decide the arbitration issue, the district court had to conclusively decide that the oil checkers and palette makers were covered by the collective bargaining agreement before the grievance could be sent to arbitration. *Hinckley & Schmitt*, 76 F.3d at 165. Because the district court did not do this, the grievance was improperly sent to arbitration. *Id.* The Seventh Circuit directed the district court to make the coverage determination even though it would require an examination of the merits of the grievance. *Id.*

Here, the Guild is arguing that non-union employees, the SMG employees who work for Niche, are performing work covered by the CBA. Instead of requesting that the work be given to existing Guild members, the Guild argues that the jobs the SMG employees are performing are Guild jobs, that the SMG employees are working for an entity, Thomson, upon which the CBA is binding and that those SMG employees should accordingly become members of the Guild. *See* Plf.'s Ex.2. Under *Hinckley & Schmitt*, the Court must determine whether the SMG employees complained of in the grievance fall within the jurisdiction of the CBA before the Court can decide whether the grievance is subject to arbitration. This determination must be made even though it requires the Court to examine the merits of the grievance. *See Hinckley & Schmitt*, 76 F.3d at 164–65.

When determining whether the employees at issue are subject to the CBA, the Court must first identify the parties that entered into the contract—those being the employer and the labor organization. Here, the CBA was entered into by the Guild and Star Publishing, Inc.. However, as both parties have noted, at the time the CBA became effective and when it was subsequently signed by the parties, more than five years had passed since Star Publishing, Inc. had been administratively dissolved. Thus, the agreement was signed on behalf of a legal entity that did not exist at the time of the signing. At the time the CBA was signed, presumably both parties knew that Star Publishing, Inc. had been administratively dissolved. Regardless of this fact, the two parties entered into the agreement and operated under the CBA from August of 1995 until its expiration in August of 1998. Such actions indicate, as does the wording of the CBA, that both parties to the agreement operated as though the employer who was bound by the agreement was SMG's operating unit, the *Tribune–Star*, which was putting out the *Tribune–Star* newspaper.

The *Tribune–Star* was the entity that contained the covered "Advertising, Edito-

rial, Circulation, and Business Office" departments for the *Tribune–Star* newspaper. Plf.'s Ex. 1 at 1. Furthermore, the pay scales specified in the CBA provide wages for positions held by *Tribune–Star* employees including reporters, circulation office workers, artists/layouts, and outside sales representatives. *Id.* at 9–11. In its grievance concerning the Niche employees, the Guild addressed its letter to Meany as both Publisher of the *Tribune–Star* and vice-president of SMG. Plf.'s Ex. 2. This suggests that the Guild knows that the employer bound by the CBA, to whom it should make complaints regarding the application of the CBA, is the *Tribune–Star*, in its role as an SMG operating unit. As Meany explained, part of his job as Publisher of the *Tribune–Star* is to supervise the administration of the five collective bargaining agreements that govern *Tribune–Star* workers, including the CBA at issue here. Meany Dep. at 8–9. It apparently did not bother either party that a corporation that had been dissolved was the employer's signatory on the CBA because regardless of the names on the CBA, the Guild continued to represent *Tribune–Star* employees who were covered by the CBA, and the operating unit of the *Tribune–Star* worked with the Guild in responding to CBA issues. Thus, as Thomson admits, it is a successor in interest to the CBA not because it owned Lincoln, who purchased all the Star Publishing, Inc. stock and owned Terre Haute Newspapers, Inc., but because the *Tribune–Star* is an operating unit of SMG, which is a division of Thomson, and the *Tribune–Star* is the employer bound by the CBA. *See* Interrog. ¶ 5.

 Thomson was a successor in interest because of the *Tribune–Star*'s involvement in the CBA. This, however, does not subject all divisions of Thomson or the operating units of SMG to the CBA. As a review of labor cases that address claims of unfair labor practices reveals, a collective bargaining agreement does not auto-

matically cover employees hired into new facilities, departments, or operations within the same division or corporation. *See Seven–Up/ Canada Dry Bottling Co.*, 1986 WL 54406 at * 6 (N.L.R.B.); *see also UPF Corp.*, 1992 WL 379106 at * 7 (N.L.R.B.) (noting that accretion has been denied to units existing in different divisions of a single employer); *Super Valu Stores, Inc. v. International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America*, 1987 WL 89522 at * 3 (N.L.R.B. Feb.27, 1987) (refusing to accrete the employees at a new facility after the employer refused to apply the collective bargaining agreement for an existing facility to those employees). In those cases where unions sought to include new employees hired into a new facility or department in a collective bargaining agreement, the National Labor Relations Board ("NLRB" or the "Board") had to address whether the new employees should be accreted into the existing bargaining unit. *Id.; see also National Labor Relations Board v. Illinois–American Water Co.*, 933 F.2d 1368, 1377 (7th Cir.1991) (explaining that accretion is "the addition of a relatively small group of employees to an existing bargaining unit where these additional employees have a sufficient community of interest with the unit employees and have no separate identity." (citations omitted)). Although the Court is not deciding a question of accretion, these cases demonstrate that a CBA binding on one division or facility of an corporation is not automatically binding on new divisions or facilities.

For example, in *Super Valu*, the employer, Super–Valu ("Employer"), was a wholesale distributor of grocery and household products. 1987 WL 89522 at * 1. Its Denver division operated a warehouse referred to as the Brighton warehouse ("Brighton"). *Id.* Driver and warehouse employees at Brighton were subject to a collective bargaining agreement entered into by the Employer and the Teamsters Local 435 ("Union").[4] *Id.* Although at

---

4. Those covered by the CBA included: warehouse persons and /or helpers; checkers or

shipping and receiving clerk; frozen food warehouse person; city drivers; over-the-

one time Brighton had stocked both grocery items and general merchandise, in 1982, when the Employer purchased Brighton, it stocked mainly grocery items, and its line of general merchandise had been reduced to a few items. *Id.* at *2. After the acquisition of a substantial customer in 1983, the Employer had a need for an increased stock of its general merchandise line. *Id.* In order to accommodate this need the Employer opened the Aurora warehouse ("Aurora") in 1984 under the name "Preferred Merchandising," and Aurora stocked the Employer's general merchandise. *Id.* When it opened the Aurora the Employer staffed it with newly hired employees but refused to apply the collective bargaining agreement from the Brighton facility to the Aurora warehouse. *Id.*

The Union filed a grievance and an unfair labor practice charge. *Id.* An arbitrator ordered the Employer to apply the collective bargaining agreement to the Aurora warehouse. *Id.* In response the Employer filed a petition with the NLRB seeking clarification of the existing Brighton unit to exclude employees of the Aurora unit. *Id.* Ultimately the Board granted the Employer's petition, concluding that the parties never agreed to include the Aurora warehouse employees in the existing Brighton unit. *Id.* Furthermore, the Board determined that the Aurora employers did not constitute an accretion to the Brighton unit. *Id.* In coming to this conclusion and differentiating the cases cited for support by the Union, the Board emphasized that it was not faced with a situation where the Employer refused to apply the collective bargaining agreement to employees previously included in the unit. *Id.* at *3. Instead, the Employer had opened a new facility and hired new employees to work at the facility. *Id.* Thus, the Board rejected the Union's argument that the Employer merely expanded an existing operation. *Id.* The Board then went on to decide that the determinative

factors in an accretion inquiry weighed in favor of the Employer. *Id.*

■ When dealing with unfair labor practice claims, Courts and the NLRB alike have differentiated the establishment of a new division with new hires from a situation where once covered employees are removed from the bargaining unit. *Id.* at *3–4. *See McDonnell Douglas Corp. v. NLRB,* 59 F.3d 230, 235–36 (D.C.Cir.1995) (suggesting that the NLRB could send a representation issue to arbitration where the issue could be determined by considering only the contract and the employees at issue had been employees under the CBA who were subsequently reclassified out of the CBA when transferred to another division). However, here, the Niche employees were newly hired for the Niche division. Meany Aff. ¶ 14. The Niche employees were not formally part of the bargaining unit and then removed from the bargaining unit. Furthermore, the Guild has offered no evidence that the shoppers and children's magazines that are now being produced by Niche were once produced by the *Tribune–Star.* Here, SMG started a new unit, Niche, whose employees were not employees from the *Tribune–Star.* Niche is a separate division of SMG.

Absent evidence to the contrary, the Court finds that the CBA does not automatically apply to all operating units or divisions of Thomson solely because Thomson is the successor in interest to the CBA by means of the *Tribune–Star,* an operating unit of its division. *See* Interrog. ¶ 5. Instead, the evidence indicates that when the Guild entered into the CBA with a then dissolved Star Publishing, Inc., the parties bound by the agreement were in fact the Guild and the *Tribune–Star,* a different operating unit than Niche. Niche is not bound by the CBA merely because the *Tribune–Star* is bound by it and both are ultimately accountable to

road drivers; pre-wrapping, pricing, cigarette stamping; janitors; tiremen, parts person, greaser and washers; lead person; garage

person; journeymen mechanics; and apprentice mechanics.

SMG, division of Thomson. Accordingly, the Niche employees could not be subject to the CBA because any work they were performing was not being done for the employer subject to the CBA, the *Tribune–Star*, but for the Niche operating unit. Niche employees are not employees of the *Tribune–Star* operating unit. While both *Tribune–Star* and Niche employees may ultimately be SMG employees, it does not automatically follow that Niche employees are subject to an contract between the *Tribune–Star* and the Guild. Therefore, any disagreement concerning the Niche employees does not arise out of the application of the CBA between the Guild and the *Tribune–Star*. Thus, the grievance is not arbitrable.

The Union urges the Court to allow the arbitrator to decide which jobs and employees are covered by the CBA. However, under *Hinckley & Schmitt*, it is the Court's responsibility to determine whether the Niche employees may be covered before it can send the question to the arbitrator. Unlike the situation in *Hinckley & Schmitt* where the employees in question clearly worked for the employer who had signed the CBA and had in fact been performing those same tasks without CBA protection for approximately twenty years before the Union filed its grievance, here different units of SMG are implicated and the employees in question were newly hired to work in the Niche operating unit. Meany Aff. ¶ 14. Although the Guild argues that it is not seeking representational rights over the Niche employees but is only seeking to gain control of the work that belongs to its bargaining unit, the Guild's grievance itself lists as the adjustment sought "[r]ecognize SMG employees as Guild employees...." Plf.'s Ex. 2. If the Guild wishes to gain representation over the workers who allegedly are performing Guild duties at Niche or to request that the work being done at Niche instead be given to *Tribune–Star* employees, the Guild will have to explore some other means for doing so. The grievance it filed against "Star Publishing, Inc." concerning Niche employees is not arbitrable under the CBA between the Guild and the *Tribune–Star*.

### CONCLUSION

In order to decide whether the grievance should be sent to arbitration, the Court must first determine whether the SMG employees that are the subject of the grievance are in fact covered by the CBA. *See Hinckley & Schmitt*, 76 F.3d at 164–65. The Court finds that the SMG employees who work for Niche are not covered by the CBA. Accordingly, a dispute concerning them does not arise out of the application of the CBA and therefore, is not arbitrable. Thus, the Guild's Motion for Summary Judgment is **DENIED**. Thomson's Motion for Summary Judgment is **GRANTED**. No triable issues remain and Thomson is granted judgment as a matter of law.