**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 09-1989

RITE AID OF PENNSYLVANIA, INC.

vs.

UNITED FOOD AND COMMERCIAL WORKERS UNION,
LOCAL 1776,

<u>Appellant</u>.

On Appeal from the United States  District Court
for the Middle District of Pennsylvania
(D.C. Civil No. 08-33)
District Court Judge: Honorable Christopher C. Conner

Argued November 10, 2009

Before: AMBRO, GARTH, and ROTH, <u>Circuit Judges</u>

(Opinion Filed: February 16, 2010 )

Andrew W. Allison [**ARGUED**]
Jonathan B. Sprague
Darren M. Creasy
1600 John F. Kennedy Blvd.
Philadelphia, PA 19103
     Counsel for Appellee

Nancy B. G. Lassen
Laurence M. Goodman [**ARGUED**]
1845 Walnut Street, 24th Floor
Philadelphia, PA 19103
     Counsel for Appellant

---

**OPINION OF THE COURT**

---

GARTH, Circuit Judge:

In this appeal, we must decide whether the parties had agreed to arbitrate a labor dispute, thereby rendering it arbitrable under the parties' collective bargaining agreement. The District Court concluded that they had not, and we will affirm.

## I.

Rite Aid of Pennsylvania, Inc. ("Rite Aid") operates a chain of drugstores in Pennsylvania. United Food and

Commercial Workers, Local 1776 ("the Union") represents non-managerial employees in Rite Aid's eastern Pennsylvania stores. Rite Aid and the Union are parties to three separate collective bargaining agreements (CBAs) covering Rite Aid stores in twenty-four Pennsylvania counties.[1]

In 2007, Rite Aid acquired a chain of drugstores formerly operated by Brooks Eckerd. The employees of the newly-acquired stores were not yet represented by the Union. When Union representatives attempted to enter six of the new stores in September 2007, Rite Aid denied them entry.

On November 7, 2007, the Union filed three identical grievances (one under each CBA), asserting that the CBAs conferred upon the Union a right to access newly-acquired or newly-opened stores within each CBA's geographic jurisdiction.

---

[1]One CBA covers the Northeast Division, which comprises Lehigh, Northampton, Northumberland, Montour (erroneously given as "Monture" in the CBA), Carbon, Wayne, Monroe, Wyoming, Susquehanna, Luzerne, Columbia, Sullivan, Lycoming, Lackawanna, and Pike counties. The Philadelphia Division agreement covers Rite Aid stores in Philadelphia, Delaware, Bucks, Montgomery, and Chester counties. The Reading Division CBA extends to stores in Schuylkill, Lancaster, Berks and Lebanon counties.

The parties agree that the three CBAs are identical in all respects relevant to this appeal. For the sake of convenience, we will therefore refer to "the CBA" as though there were a single agreement between Rite Aid and the Union.

Rite Aid denied the grievances, citing a policy against solicitation. The Union referred the three grievances to arbitration, where they were consolidated into a single proceeding, and a hearing date was set.

Prior to the arbitration hearing, Rite Aid filed an action in the United States District Court for the Middle District of Pennsylvania, seeking a declaratory judgment of the grievances' non-arbitrability. On July 1, 2008, the parties filed cross-motions for summary judgment.

Rite Aid argued that the grievances were not arbitrable in light of Section 11.4 of the CBA, which provides: "No grievance shall be filed by the associate or the Union, nor need the Employer entertain any grievance that does not involve the *interpretation of any provision of this Agreement*." (emphasis added). The Union responded by citing three CBA provisions under which it purported to assert its store-access grievances. The Union argued that because its grievances arose under at least one of those provisions, arbitration was required, regardless of the grievances' merits.

On March 31, 2009, the District Court granted Rite Aid's motion and denied the Union's motion. The court found that the grievances did not involve the interpretation of any CBA provisions, and that they therefore fell outside the scope of the CBA's arbitration clause. The Union filed a timely notice of

appeal.[2]  We have jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

The District Court's decision regarding the applicability and scope of the parties' arbitration agreement is subject to our plenary review.  United Steelworkers of Am. v. Rohm and Haas Co., 522 F.3d 324, 330 (3d Cir. 2008); Harris v. Green Tree Financial Corp., 183 F.3d 173, 176 (3d Cir. 1999).[3]  In reviewing a District Court ruling on a motion for summary judgment, we apply the same test District Courts are to apply under Fed. Rule. Civ. P. 56(c).  Brown v. J. Kaz, Inc., 581 F.3d 175, 179 (3d Cir. 2009).  Summary judgment is appropriate if and only if, after the evidence taken as a whole is construed in the light most favorable to the non-moving party, there remains no genuine issue of material fact.  Prowel v. Wise Business Forms, Inc., 579 F.3d 285, 286 (3d Cir. 2009).

---

[2]The consolidated grievances remain in arbitration pending the outcome of this appeal.

[3]In earlier cases, we had treated a District Court's arbitrability decision as a finding of fact with respect to the parties' intent to arbitrate a particular dispute, and reviewed only for clear error.  See Lukens Steel Co. v. United Steelworkers of Am., 989 F.2d 668, 672 (3d Cir. 1993); John F. Harkins Co., Inc. v. Waldinger Corp., 796 F.2d 657, 659-60 (3d Cir. 1986).  In Rohm and Haas, however, we clarified that this more deferential standard applies only where the relevant documents are ambiguous.  See 522 F.3d at 330 n.7.

The venerable legal principles guiding the construction and enforcement of arbitration clauses in collective bargaining agreements are well established. We have often recognized the strong federal policy in favor of resolving labor disputes through arbitration. See, e.g., United Parcel Service, Inc. v. Int'l Brotherhood of Teamsters, Local Union No. 430, 55 F.3d 138, 141 (3d Cir. 1995); Laborers' Int'l Union of N. Am. v. Foster Wheeler Corp., 26 F.3d 375, 399 (3d Cir. 1994); Exxon Shipping Co. v. Exxon Seamen's Union, 11 F.3d 1189, 1196 (3d Cir. 1993). More specifically, the inclusion of a broad arbitration clause in a collective bargaining agreement gives rise to a presumption of arbitrability which may be rebutted only by "the most forceful evidence of a purpose to exclude the claim from arbitration." AT&T Techs., Inc. v. Comm's Workers of Am., 475 U.S. 643, 650 (1986) (quoting United Steelworkers of Am. v. Warrior & Gulf Nav. Co., 363 U.S. 574, 585 (1960)). The parties agree that the arbitration provisions in the CBA at issue are broad, and that the presumption of arbitrability therefore applies in this case.

Notwithstanding that presumption, "arbitration is still a creature of contract and a court cannot call for arbitration of matters outside of the scope of the arbitration clause." Rohm and Haas Co., 522 F.3d at 332. Unless the parties clearly provide otherwise, the courts, not the arbitrators, are tasked with interpreting agreements in order to determine whether the parties have indeed agreed to arbitrate disputes whose arbitrability is contested. See AT&T Techs., 475 U.S. at 649, 651; Local 827 v. Verizon New Jersey, Inc., 458 F.3d 305, 309 (3d Cir. 2006). In making that determination, a court is not to examine the potential merits of the claim sought to be arbitrated,

-6-

except as we point out in Part IV, where the claim's merits and its arbitrability are inextricably intertwined. See Lukens, 989 F.2d at 672. Rather, the court is limited to the construction of the arbitration clause and any contractual provisions relevant to its scope, as well as any other "forceful evidence" suggesting that the parties intended to exclude the disputes at issue from arbitration. See E.M. Diagnostic Sys., Inc. v. Local 169, 812 F.2d 91, 95 (3d Cir. 1987).

Where an arbitration clause in a collective bargaining agreement limits arbitration to those disputes which require interpretation of the agreement, as it does here, a grievance is excluded from arbitration unless it arises from a specific provision in the agreement. See Rohm and Haas, 522 F.3d at 332 ("Although we hold that the Bristol CBA's arbitration clause is broad, the underlying basis for the grievance submitted through the Bristol CBA grievance procedure must still arise from some specific article of the Bristol CBA."). We may not accept an arbitration proponent's citation to a particular provision of the CBA and its claim that the grievance arises thereunder without critical examination. Unquestioning acceptance of the Union's characterization of its claims is inconsistent with our duty to determine arbitrability because it "leaves the scope of the arbitration clause subject to the unilateral and unfettered discretion of the Union." E.M. Diagnostic, 819 F.2d at 95. We must determine whether indeed "the subject matter of the grievance is one that is within the zone of interests that have received protection in the collective bargaining agreement" and one that the parties have agreed to arbitrate. Id.

Having outlined the controlling principles, we turn now to their application to the grievances and arbitration clause in the present case.

## III.

Article 11 of the CBA creates a procedure under which the Union or one of its members may file grievances with Rite Aid. The CBA provides for review of the grievance by progressively higher levels of Rite Aid management and, if the dispute is not amicably resolved, ultimately for resolution of the dispute by an arbitrator.[4]

As noted <u>supra</u>, the scope of the arbitration provision in the CBA is broad but not unbounded. Section 11.4 of the CBA provides: "No grievance shall be filed by the associate or the Union, nor need the Employer entertain any grievance that does not *involve the interpretation of any provision of this*

___

[4]Under Sections 11.1 and 11.2 of the CBA, grievances are first to be filed with the store manager, and if not resolved within two days, next submitted to a Rite Aid Human Resources Manager. If the dispute is not resolved in the following three days, it is presented to Rite Aid's Director of Labor Relations. If the matter is still unresolved three days after that, the grievance is referred to arbitration. Under Section 11.3.1 (labeled Section 11.3 in the Philadelphia Division CBA), the arbitrator is selected jointly by the parties or, in the event the parties cannot agree, selected pursuant to the rules of the American Arbitration Association.

-8-

*Agreement.*" (emphasis added). Thus, the plain language of the CBA indicates that the parties have agreed to arbitrate only those disputes which genuinely implicate one or more provisions of the CBA. Our task is therefore to decide whether the Union's store-access grievance falls within the scope of the arbitration clause by raising a legitimate question of the CBA's interpretation.

The Union points to three provisions of the CBA, contending that each provides a basis for its claim that Union representatives are entitled to access Rite Aid's newly-acquired stores and their employees. We examine each in turn.

### A.     Recognition Clause

Section 2.1 of the CBA reads:

> The Employer recognizes the Union as the sole and exclusive bargaining agent for the purpose of bargaining in the Bargaining Unit in respect to rates of pay, wages, hours of employment, and other conditions pertaining to employment . . . .

The Union argues that its interpretation of this clause gives rise to its access grievance.

We are not persuaded by the argument the Union advances based on the decision of the National Labor Relations Board (NLRB) in Houston Div. of the Kroger Co., 219 N.L.R.B.

388 (1975). In <u>Kroger</u> the NLRB held that a recognition clause similar to the one at issue in this case waives an employer's right to demand an election in a new or after-acquired store, but that the union is nevertheless required to demonstrate majority support among employees of those stores before it can be recognized. <u>Id.</u> at 389. However, the NLRB did not specify the means by which unions are to demonstrate majority support in this situation. The Union here argues that the CBA at least arguably grants it a right of store access, and it is therefore entitled to present that claim to an arbitrator.

This strikes us as a non sequitur. The NLRB's failure to specify the means of establishing majority support in cases where the employer has waived its right to an election simply does not suggest that the Union must be allowed access to *newly-acquired stores*. The Union has not explained why any of the methods that might meet the NLRB's approval would require its organizers to enter the store. If there is ambiguity in <u>Kroger</u>, it does not translate to ambiguity in the instant CBA.

The Union points to several arbitration decisions recognizing a right of access to newly-acquired stores, and contends that its present grievance must indeed involve interpretation of the recognition clause, since that interpretation has in fact been accepted by several arbitrators.[5]

---

[5]We find it rather curious that the Union charges the District Court with reaching the merits of the instant dispute in the course of declaring it non-arbitrable (<u>see</u> <u>infra</u> Part IV), while simultaneously urging us to consider favorable (to the

Even were we to consider them, the merits decisions relied upon by the Union would not persuade us that the grievance is arbitrable. The Union calls our attention to a decision from the District of Oregon confirming an arbitration award under a CBA that *included* a provision specifically providing for the applicability of the CBA to new stores. The CBA in that case included the following provision: "The Employer agrees then *if the Employer should establish a new retail food store or stores located in Clark County, Washington*, and in the jurisdiction of Local 555, that as of the time such store is established this Agreement shall apply to all employees in job classifications set forth herein." Albertson's, Inc. v. Local 555, Civil No. 97-977-JO, slip op. at 4 (D. Or. 1998) (emphasis added).

The CBA in the instant case contains no such provision.[6]

_____

Union) merits decisions as evidence of the dispute's arbitrability. The merits and arbitrability questions are distinct, and a court must limit itself to addressing the latter, regardless of whether the merits appear favorable or unfavorable to an arbitration proponent.

[6]Another recent case submitted by the Union pursuant to Fed. R. App. P. 28(j), PPG Indus. v. Int'l Chemical Workers Union Council, 587 F.3d 648 (4th Cir. 2009), is inapposite. In PPG, the employer sought to vacate an arbitration award involving the interpretation of a term in a bonus plan that had been expressly incorporated into a CBA with a mandatory arbitration clause. Both parties agreed in PPG that the bonus

To the extent that decisions of other arbitrators have found in favor of unions relying on the analysis of Kroger and the theory referred to above, we simply do not find them persuasive.

In our view, a right of Union access to newly acquired stores simply cannot be plausibly derived from the recognition clause. The recognition clause merely establishes the Union's position as Rite Aid's employees' exclusive bargaining agent and defines the range of matters subject to bargaining. It does not describe or purport to include anything resembling the Union's claimed right to access newly-acquired stores. The District Court correctly concluded that the recognition clause is not susceptible of an interpretation which would yield such a right.

### B.    Observation Clause

The Union next relies on Section 5.1 of the CBA, which

---

plan was subject to the CBA's arbitration provisions; the employer merely disagreed with the arbitrator's interpretation of what the employer termed the "plain language" of the plan.

The District Court vacated the arbitration award, but the Fourth Circuit reversed, writing that "[t]he Company's argument simply constitute an attack on the *correctness* of the arbitrator's decision. A court has no warrant to determine the correctness of the arbitrator's award." Id. at 653. By contrast, in the instant case Rite Aid challenges only whether the Union's grievance is arbitrable inasmuch as neither Rite Aid nor the Union ever agreed to arbitrate the access issue.

-12-

provides in relevant part:

> It is agreed that the Union duties and activities will not be carried on during work. This shall not prevent the Union officials from entering the Employer's establishments to satisfy that this Agreement is being observed, provided that same shall not interfere with the normal operations or business of the store.

The Union argues that its grievance is arbitrable because it alleges that the Union's exclusion from the newly-acquired Eckerd stores violated this provision of the CBA.

We question the Union's reading of this provision, and its argument. The CBA cannot apply to the newly-acquired stores or to their employees because the Union does not presently represent those stores' employees. (This is, of course, the very reason the Union seeks access to the stores.) We agree with the District Court that it is not possible for the Union to ensure compliance with the instant CBA at stores to which the CBA does not apply. Accordingly, the Union's store-access grievance does not require interpretation of Section 5.1, the observation clause, and arbitration is not properly invoked by reliance on this provision.

### C.    Privileges Clause

Finally, the Union relies on Section 15.3, which provides:

Only privileges which have been granted by the present Employer since its acquisition of the establishments covered by this Agreement shall be continued.

The Union alleges that before the acquisition of the Brooks Eckerd stores, Rite Aid had permitted it to enter other new stores. Thus, according to the Union, the right of access is a privilege that "shall be continued" under the CBA – or, at the least, this interpretation is sufficiently plausible to conclude that the Union's grievances indeed arise from an interpretation of the CBA.

A right of access cannot be considered one of the "privileges" referenced in Section 15.3 unless the clause's context and provisions are entirely ignored. Article 15 is titled "Miscellaneous Working Conditions," and all of its provisions deal with the rights and responsibilities of *employees* covered by the CBA. The privileges to which the CBA refers are not privileges of the Union. For example, Section 15.4 establishes the rules under which worked time is recorded; Section 15.5 requires Rite Aid to furnish employees' uniforms; Section 15.6 sets out the circumstances under which employees are to be held liable for cash shortfalls; Section 15.8 permits associates to transfer between the front end and pharmacy departments "in accordance with seniority and ability," and so forth.

The Union argues that this contextual analysis intrudes into territory reserved for the arbitrator. However, our recent precedent confirms our ability to consider the context of a CBA provision in order to determine whether it is sufficiently

-14-

implicated by a grievance that one party seeks to arbitrate.

In Rohm & Haas, supra, the parties contested the arbitrability of a denial of disability benefits. Management and the employee's union had negotiated a Collective Bargaining Agreement containing an arbitration clause, but disability benefits were provided only under a separate ERISA plan lacking any arbitration provisions. The employee argued, inter alia, that his denial-of-benefits grievance arose under the Agreement because one provision of the agreement made reference to the ERISA benefits plan in describing the procedures to be followed in case of a disagreement over whether an employee should be considered physically incapable of working. 522 F.3d at 328-29.

We rejected this argument after examining the context, which revealed that the provision "contemplates a situation where an employee seeks to continue working in spite of a potential disability." Id. at 334. Because the employee did not propose to continue working, we found that the Agreement did not apply to the employee's grievance, and the denial-of-benefits claim was therefore not arbitrable. We concluded: "We do not find any ambiguity in the [CBA] that would permit it to be reasonably interpreted to provide for disability benefits or to provide for arbitrating a plan administrator's denial of such benefits arising from a separate ERISA plan."[7] Id.

_____

[7]Rohm & Haas is a recent opinion of this Court. As my dissenting colleague concedes, this Court was required to consider "*substantive provisions of the collective bargaining*

-15-

Similarly here, the entire context of Section 15.3 makes clear that the "privileges" discussed in Article 15 pertain to Rite Aid's employees' working conditions. Article 15 has nothing to do with the Union's right to organize or to be recognized in newly-acquired stores. The Union's grievances as to store access simply do not involve an interpretation of Section 15.3, and thus do not come within the scope of the CBA's arbitration clause.

In sum, Section 11.4 of the CBA, which provides that "[n]o grievance shall be filed by the associate or the Union, nor need the Employer entertain any grievance that does not involve the interpretation of any provision of this Agreement," constitutes "forceful evidence," particularly in light of the context that we have analyzed, that the parties intended to exclude from arbitration claims which arise wholly outside the scope of the CBA. The Union's store-access grievance does not

---

*agreement* to determine whether, as the union argued, "'disability benefits" are considered "working conditions" [under the collective bargaining agreement].'" Dissent at n.18 (emphasis added). This being so, it is obvious that the merits may be considered when necessary to determine arbitrability. The dissent does not take issue with Rohm & Haas, as it cannot, because Rohm & Haas is a precedential opinion of this Court. Indeed, the dissent does not attempt to explain why we should not be bound by this very recent binding precedent. The dissent's discussion of Rohm & Haas, significant though it is, is confined to a single footnote. We are content to rely upon Rohm & Haas as a precedent in this Circuit.

-16-

fall within the scope of the CBA's arbitration clause because it does not require the interpretation of any of the CBA's provisions.[8]

## IV.

The Union additionally argues that the District Court impermissibly considered the merits of its grievance in making its arbitrability determination. We cannot agree. Decisions of the Supreme Court and Courts of Appeals have made clear that where the merits and arbitrability questions are inextricably intertwined, a court's arbitrability decision may, of necessity, touch incidentally on the merits.

In Litton Financial Printing Div. v. NLRB, 501 U.S. 190 (1991), the union representing Litton's employees sought to arbitrate a dispute over layoffs of ten workers, including Litton's six most senior employees. Like the CBA in this case, the Agreement contained an arbitration provision whose scope was

---

[8]We observe as did the District Court that Article 25 of the CBA provided Rite Aid with the right to "open new establishments of any kind." The Philadelphia Division version of the CBA also contained a Section 2.3, which required Rite Aid to "notify the Union of any new store openings or acquisitions within the five (5) county Philadelphia area." If the parties had intended a right of access to be encompassed by the CBA's arbitration clause, it surely would have appeared in the CBA in the context of these provisions. No such provision appears anywhere in the CBA.

limited to disputes "regarding [the] Agreement and any alleged violations of the Agreement, [and] the construction to be placed on any clause or clauses of the Agreement." Id. at 194. The Litton CBA provided that, "in case of layoffs, lengths of continuous service will be the determining factor if other things such as aptitude and ability are equal." Id. However, because the agreement had expired nearly a year before the layoffs occurred, Litton contested the grievance's arbitrability. The union argued that the seniority provision created a vested right which survived the expiration of the agreement, and thus the layoffs constituted violations of the agreement notwithstanding that they had occurred after expiration.

The Supreme Court ruled for Litton and held the grievance non-arbitrable. It noted that "[o]nly where [factors such as aptitude and ability] were equal was the employer required to look to seniority." Id. at 210. The Court reasoned: "The important point is that factors such as aptitude and ability do not remain constant, but change over time. They cannot be said to vest or accrue or be understood as a form of deferred compensation. . . . We cannot infer an intent on the part of the contracting parties to freeze any particular order of layoff or vest any contractual right as of the Agreement's expiration." Id. Only after it construed the disputed provision and determined that no rights were vested was the Court able to conclude that the grievance did not arise under the Agreement, and was thus non-arbitrable.

The Union in this case characterizes Litton as inapplicable because this case does not involve an expired CBA, but Litton is not so easily distinguished. Because the Agreement

-18-

limited the scope of arbitration to matters regarding the agreement or its construction, the Supreme Court in Litton found it necessary to interpret the agreement in order to properly determine the question of arbitrability. The Union here would argue that the Supreme Court had accordingly reached the merits, but because the merits and arbitrability issues were inextricably intertwined in Litton, the Supreme Court found it necessary to refer to the merits in order to determine what the parties had agreed to arbitrate.

We are presented with a similar situation in this case. In the words of the Supreme Court, "we must determine whether the parties agreed to arbitrate this dispute, and we cannot avoid that duty because it requires us to interpret a provision of a bargaining agreement," even if we trench to some extent upon the merits. Id. at 209.

We are not the first Court of Appeals to read Litton this way, or to employ an analysis recognizing the entwining of the merits and agreed-upon arbitrability questions. Int'l Brotherhood of Elec. Workers v. GKN Aerospace N. Am., Inc., 431 F.3d 624 (8th Cir. 2005), involved a dispute over whether an employee who had been promoted to a supervisory position had a right to return to the bargaining unit. Because the arbitration provision was limited to matters related to the collective bargaining agreement, the Eighth Circuit held that the arbitrability determination required it to interpret various clauses of the agreement. See id. at 629-30. The court understood Litton to mean that "the judicial responsibility to determine arbitrability takes precedence over the general rule to avoid consideration of the merits of a grievance." Id. at 628.

-19-

In Independent Lift Truck Builders Union v. Hyster Co., 2 F.3d 233 (7th Cir. 1993), another case limiting arbitration to disputes arising out of a collective bargaining agreement, the Seventh Circuit observed that "a court cannot address the arbitrability question without at the same time addressing the underlying merits of the dispute." Id. at 236. After discussing Litton, the court concluded: "If the court must, to decide the arbitrability issue, rule on the merits, so be it." Id. Indeed, both this court and our sister courts had conducted a similar analysis even before Litton. See E.M. Diagnostic, 812 F.2d at 95; United Steelworkers Local No. 1617 v. Gen. Fireproofing Co., 464 F.2d 726, 729 (6th Cir. 1972) ("In order to determine then whether the parties have agreed to arbitrate [the matter at issue], we must examine the collective bargaining agreement . . . to see if, under any reasonable interpretation, agreement to arbitrate can be found."); Peerless Pressed Metal Corp. v. Int'l Union of Electrical, Radio and Machine Workers, 451 F.2d 19, 21 (1st Cir. 1971) (holding a dispute arbitrable because it arose under a construction of an agreement that, while "weak," was not "impossible" or "inconceivable").

## V.

We will affirm the District Court's judgment dated March 31, 2009, that the parties had not agreed to arbitrate the issue of access to the Eckerd stores and their employees.

AMBRO, Circuit Judge, dissenting

The Majority concludes that the Union's grievances are not arbitrable based on its assessment of the merits of the Union's claims. Because I do not believe that analysis is authorized by either Supreme Court precedent or our own precedent, I respectfully dissent.

## I.    Background

To review, United Food and Commercial Workers Union, Local 1776 (the "Union" or "Local 1776"), has represented Rite Aid employees in 24 Pennsylvania counties for several decades. In June 2007, Rite Aid acquired a drugstore chain formerly operated by Brooks Eckerd. Several of these stores are located in counties covered by a collective bargaining agreement (the "CBA")[9] between Ride Aid and Local 1776. During September and October 2007, representatives of Local 1776 attempted to enter six of these stores to solicit employee interest in joining the Union. Rite Aid barred these representatives from entering the stores.

In November 2007, Local 1776 Executive Vice President Nicholas Farina filed three identical grievances with Niels Hansen—Rite Aid's Director of Labor Relations—alleging that Rite Aid had interfered with the Union's "exercise of [its] visitation rights as prescribed under the [CBA]." Mr. Hansen

---

[9] Like the Majority, I refer to the parties' collective bargaining agreements as a single "CBA." Maj. Op. at 3 n.1.

denied the grievances, relying on Rite Aid's "no solicitation" policy. That policy—for which the effective date is unknown—prohibits the "[s]olicitation for any cause or distribution of material . . . if one or more of the Rite Aid Associates engaged in the interaction is on working time." The policy does not reference Union activities, but purports to apply to "associate and non-associate activity on behalf of any cause or organization, with the exception of Company-sponsored charity events."

When Local 1776 advised Rite Aid of its intent to submit the grievances to arbitration, Rite Aid filed a complaint in the federal District Court for the Middle District of Pennsylvania seeking a declaratory judgment that the Union's grievances were not arbitrable.[10] The parties filed cross-motions for summary judgment with supporting declarations.[11] In March 2009, the

_____

[10] I note that at least two other courts have rejected Rite Aid's attempts to bypass arbitration of similar disputes. *See Rite Aid of N.Y., Inc. v. United Food and Commercial Workers Int'l Union Local One*, No. 07-cv-708, 2009 WL 185764 (W.D.N.Y. Jan. 23, 2009)*; 1199 SEIU, United Healthcare Workers East v. Rite Aid Corp.*, No. 07-cv-4816, 2008 WL 762090 (S.D.N.Y. Mar. 24, 2008).

[11] The Union submitted the declaration of Executive Vice President Farina, in which he averred that: (1) prior to the current dispute, he was "not aware that Rite Aid had a [n]on-solicitation policy at any of its retail stores" within the counties covered by the CBA; and (2) Rite Aid "had, for decades, permitted [Union] representatives . . . to have access

-22-

District Court granted Rite Aid's motion and denied the Union's motion. This appeal followed.

## II. The *Steelworkers* Principles

Fifty years ago, the Supreme Court decided three cases, collectively known as the "*Steelworkers* Trilogy," which establish the principles that guide our determination of whether a grievance is arbitrable. *See United Steelworkers of Am. v. Am. Mfg. Co.*, 363 U.S. 564 (1960); *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574 (1960); *United Steelworkers of Am. v. Enter. Wheel & Car Corp.*, 363 U.S. 593 (1960). As the Supreme Court has observed, "[t]hese precepts have served the industrial relations community well, and have led to continued reliance on arbitration . . . as the preferred

to both newly acquired and newly opened Rite Aid stores within the geographic jurisdiction of [the] CBA[], for the purpose of soliciting Rite Aid's employees for membership in [the Union]." Rite Aid submitted the declaration of Human Resources Manager Mark Firment—who has been employed by Rite Aid since February 2000—in which he averred that, "[t]o the best of [his] knowledge, information and belief, Rite Aid's [n]on-solicitation [p]olicy has been and continues to be consistently enforced throughout all of Rite Aid's stores, including, but not limited, to [the six Brooks Eckerd stores that Union members attempted to enter]." Mr. Firment's declaration did not address whether the policy has ever been applied to Union representatives seeking to enter Rite Aid stores to solicit membership.

-23-

method of resolving disputes arising during the term of a collective-bargaining agreement." *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986). Those precepts are as follows.

(1) "[A]rbitration is a matter of contract[,] and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Warrior & Gulf*, 363 U.S. at 582.

(2) Unless the parties "clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." *AT&T Techs.*, 475 U.S. at 649 (*citing Warrior & Gulf*, 363 U.S. at 582–83).

(3) In deciding whether the parties have agreed to arbitrate a particular grievance, courts may "not . . . rule on the potential merits of the underlying claims." *Id.* The Supreme Court has stated this prohibition in forceful terms:

> Whether "arguable" or not, indeed *even if it appears to the court to be frivolous*, the union's claim that the employer has violated the collective-bargaining agreement is to be decided, not by the court asked to order arbitration, but as the parties have agreed, by the arbitrator. "The courts, therefore, have no business weighing the merits of the grievance, considering whether there is equity in a particular claim, or determining whether there is particular language in the written instrument which will support the claim. The agreement is to submit all grievances to

-24-

arbitration, not merely those which the court will deem meritorious."

*Id.* at 649–650 (*quoting Am. Mfg. Co.*, 363 U.S. at 568) (emphasis added).

Thus, where the parties have agreed to "submit all questions of contract interpretation to the arbitrator," the court's function is "very limited"; "[i]t is confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract." *Am. Mfg. Co.*, 363 U.S. at 567–68. This principle implements the "federal policy of settling labor disputes by arbitration[, which] would be undermined if courts had the final say on the merits" of a grievance. *Enter. Wheel & Car Corp.*, 363 U.S. at 596. Accordingly, "[a] court should view with suspicion an attempt to persuade it to become entangled in the construction of the substantive provisions of a labor agreement, even through the back door of interpreting the arbitration clause, when the alternative is to utilize the services of an arbitrator." *Warrior & Gulf*, 363 U.S. at 585.

(4) A presumption of arbitrability applies where a collective bargaining agreement contains an arbitration provision. This presumption is "particularly applicable" where, as here, the arbitration provision is broad. *AT&T Techs.*, 475 U.S. at 650 (arbitration provision that provided for arbitration of "any differences arising with respect to the interpretation of this contract or the performance of any obligation hereunder" was broad); *see also Warrior & Gulf*, 363 U.S. at 576 (arbitration provision that provided for arbitration of "differences . . . as to

-25-

the meaning and application of the provisions" of the collective bargaining agreement was broad). "In such cases, '[i]n the absence of any express provision excluding a particular grievance from arbitration, . . . only *the most forceful evidence* of a purpose to exclude the claim from arbitration can prevail.'" *AT&T Techs.*, 475 U.S. at 650 (*quoting Warrior & Gulf*, 363 U.S. at 584–85) (emphasis added) (alteration in original).

## III.   Discussion

We have identified three questions to guide our application of the *Steelworkers* principles where the bargaining agreement's arbitration provision is broad and the presumption of arbitrability applies:

> (1) Does the present dispute come within the scope of the arbitration clause?[;] (2) does any other provision of the contract expressly exclude this kind of dispute from arbitration?[;] and (3) is there any other 'forceful evidence' indicating that the parties intended such an exclusion?

*E.M. Diagnostic Sys., Inc. v. Local 169, Int'l Bhd. of Teamsters*, 812 F.2d 91, 95 (3d Cir. 1987); *accord United Steelworkers of Am. v. Rohm and Haas Co.*, 522 F.3d 324, 331 (3d Cir. 2008). I address these questions in turn.

A.     The Union's Grievances Come Within The Scope
Of The Arbitration Provision

The parties' CBA contains a provision governing the procedure for the filing and arbitration of grievances, which states that "[n]o grievance shall be filed by . . . the Union, nor need [Rite Aid] entertain any grievance that does not involve the interpretation of any provision of this Agreement."  This provision thus limits the grievances that the Union may file—and, if rejected by Rite Aid, refer to arbitration—to those that "involve the interpretation of any provision of" the CBA.

The Union's asserted right to enter Rite Aid stores for the purpose of soliciting membership is founded on its interpretation of three provisions of the CBA—the "Recognition," "Observation," and "Privileges" Provisions.  Accordingly, the Union argues that its grievances fall within the "scope" of the CBA's arbitration mandate because it has made a claim which "on its face is governed by the [CBA]," *Am. Mfg. Co.*, 363 U.S. at 567–68—that is, on its face Local 1776's asserted right of store access "involve[s] the interpretation" of provisions of the CBA.

1.     The Distinction Between The Subject
Matter And The Merits Of A Grievance

The Union's characterization of its grievances is not the end of the matter.  As the Majority points out, "[u]nquestioning acceptance of the Union's characterization of its claims" would "'leave[] the scope of the arbitration clause subject to the unilateral and unfettered discretion of the Union.'"  Maj. Op. at

-27-

7 (*quoting E.M. Diagnostic*, 812 F.2d at 95). The concern is that an arbitration proponent could achieve arbitration of a grievance—the subject matter of which is wholly outside the scope of the collective bargaining agreement—simply by "cit[ing] to a particular provision of the CBA," claiming that its "grievance arises thereunder," and contending that a court would be impermissibly reviewing the merits if it were to reject the Union's characterization. *Id.*

We addressed this concern in *E.M. Diagnostic*, where we considered the arbitrability of a grievance challenging a company's decision to subcontract work to an agency that did not employ members of the union. 812 F.2d at 92. Because the arbitration provision was broad,[12] we applied the presumption of arbitrability and concluded that the grievance was arbitrable, even though (1) the collective bargaining agreement there explicitly granted the company the right to subcontract, and (2) the grievance simply alleged that the employer's decision to subcontract was "unfair" and "a clear case of violating the contract." *Id.*

Despite our concluding that the grievance was arbitrable, we rejected the union's argument that its bare claim of a "violation" of the collective bargaining agreement was alone sufficient to make the dispute arbitrable, as "[s]uch an

---

[12] The collective bargaining agreement at issue in *E.M. Diagnostic* provided for arbitration of "[a]ny dispute arising out of a claimed violation of [the collective bargaining agreement]." *Id.* at 92.

interpretation . . . leaves the scope of the arbitration clause subject to the unilateral and unfettered discretion of the Union." *Id.* at 95. Instead, we adopted the following test for determining whether a grievance comes within the "scope" of an arbitration provision:

> It will suffice for present purposes to hold that a claimed contract violation comes within the scope of an arbitration clause of this character when the subject matter of the grievance is one that is *within the zone of interests that have received protection in the collective bargaining agreement.* To require more, we believe, would infringe upon territory reserved for arbitrators in *AT&T Technologies.*

*Id.* (emphasis added). Applying this test, we had "no difficulty" concluding that the union's subcontracting grievance fell within the "zone of interests" protected by the collective bargaining agreement. *Id.* at 96. We reasoned that though the agreement granted the company the right to subcontract, there must be "implicit" limits on that right; otherwise, the company could subcontract *all* work in the bargaining unit, which would be "inconsistent with the [collective bargaining] agreement's recognition of the Union as the bargaining agent for the Company's employees." *Id.*

Underlying our decision in *E.M. Diagnostic* is the crucial distinction between two inquiries: (1) whether a grievance comes within the "scope" of the arbitration provision (*i.e.*, whether its subject matter falls within "the zone of interests that

-29-

have received protection" in the collective bargaining agreement); and (2) whether the grievance itself has merit. In my view, distinguishing between these questions is critical to ensuring that we do not overstep our "very limited" role in determining whether a grievance must be arbitrated. *Am. Mfg. Co.*, 363 U.S. at 567.

To demonstrate, imagine a collective bargaining agreement that requires the employer to pay employees overtime wages for work in excess of 35 hours a week. Imagine further that the Union files a grievance challenging the employer's refusal to pay overtime wages for work in excess of 30 hours a week. In such a circumstance, we could rightfully characterize the Union's grievance as "frivolous," given the agreement's express language to the contrary. We could not, however, say that the "subject matter" of the grievance—*i.e.*, the circumstances in which the employer is required to pay overtime wages to its employees—falls outside the "zone of interests" that have received protection in the agreement. Rather, we are compelled to call for arbitration of the dispute because, although the grievance "appears . . . to be frivolous, the union's claim that the employer has violated the collective bargaining agreement is to be decided, not by the court asked to order arbitration, but as the parties have agreed, by the arbitrator." *AT&T Techs.*, 475 U.S. at 649–50. Indeed, a contrary position would "reduce[] to an assertion" that the obligation to pay overtime wages only for work in excess of 35 hours a week "is so clear on the face of the agreement that there is no need for arbitration," which is "but another way of saying that the Union's grievance is frivolous." *E.M. Diagnostic*, 812 F.2d at 97.

-30-

Contrast that situation with a grievance that, in addition to appearing frivolous, involves a subject matter wholly outside the scope of the collective bargaining agreement. For example, a grievance challenging an employer's "decision to terminate the distribution of Christmas turkeys to its employees," in the context of an arbitration provision that applies only to grievances involving "the interpretation and application of . . . specific provisions of [the collective bargaining agreement]" (which do not include a provision even remotely applicable to the employer's prior practice of distributing Christmas turkeys), is rightly regarded as being outside the "scope of . . . arbitrable matter[s]," in addition to being frivolous. *Boeing Co. v. Int'l Union, UAW*, 349 F.2d 412, 413 (3d Cir. 1965); *see also E.M. Diagnostic*, 812 F.2d at 96 n.2 (describing *Boeing Co.* as a case where "the subject matter of the union's grievance was whol[]ly unrelated to any interest protected by the collective bargaining agreement").

2. The Subject Matter Of The Union's Grievances Comes Within The "Zone Of Interests" Protected By The CBA

Rather than explaining why the Union's grievances do not satisfy the "zone of interests" test, Maj. Op. at 7, the Majority asks whether (1) the Union's grievances "genuinely" or "sufficiently implicate[]" any provision of the CBA, *id.* at 9, 14–15; (2) the grievances "rais[e] a legitimate question of the CBA's interpretation," *id.* at 9; (3) the Recognition, Observation, and Privileges Provisions are "susceptible of [the] interpretation" the Union advances, *id.* at 12; and/or (4) the right of store access the Union seeks to enforce can be "plausibly

-31-

derived" from these provisions, *id.* In so doing, I believe the Majority strays from permissibly determining whether the Union's grievances "come within the scope" of the arbitration provision, *E.M. Diagnostic*, 812 F.2d at 95, to impermissibly determining "whether there is particular language in the [CBA] which will support the [Union's] claim." *Am. Mfg. Co.*, 363 U.S. at 568.

I express no view on the ultimate merits of the Union's grievances or its interpretations of the Observation, Recognition, or Privileges Provisions. I conclude, however, that (1) at least one of these provisions—the Recognition Provision—sufficiently demonstrates that the Union's asserted right of store access falls within the "zone of interests" that have received protection in the CBA; and (2) the Union's interpretation of the Recognition Provision is not nearly as implausible as the Majority suggests.

The CBA's Recognition Provision provides, in pertinent part (and with emphasis added):

> [Rite Aid] recognizes the Union as the *sole and exclusive bargaining agent* for the purpose of bargaining in the Bargaining Unit in respect to rates of pay, wages, hours of employment, and other conditions pertaining to employment *for . . . [a]ll full time and part time selling and non-selling associates employed at [Rite Aid] stores [within the counties identified in the CBA]*.

-32-

This provision does not distinguish between existing and newly acquired stores; rather, it applies to "all" employees "employed at [Rite Aid] stores" within the counties covered by the CBA. Accordingly, under a literal reading, it requires Rite Aid to recognize the Union as the "sole and exclusive bargaining agent" for all employees in Rite Aid stores, whether existing at the time the CBA was entered or acquired thereafter.

In 1974, the National Labor Relations Board ("NLRB") ruled that provisions of this character—also referred to as "additional stores" provisions—are unlawful because, when read literally, they purport to make the Union automatically the "exclusive bargaining agent" for employees in newly acquired or opened stores, without a Board-directed election or other demonstration of majority support. *See Houston Div. of the Kroger Co.* (*Kroger I*), 208 N.L.R.B. 928, 929 (1974) ("We will not permit parties to include employees in a newly created presumptively appropriate unit into a larger unit without a proper assessment of employee sentiment as to representation."). A year after *Kroger I*, the Court of Appeals for the D.C. Circuit disagreed with the Board's conclusion regarding the invalidity of such provisions, and concluded that they must "be interpreted to mean that the employer waives its right to a Board ordered election." *Retail Clerks Int'l Ass'n Local No. 455 v. NLRB*, 510 F.2d 802, 806 (D.C. Cir. 1975); *see also NLRB v. Retail Clerks Local 588*, 587 F.2d 984, 986 n.2 (9th Cir. 1978) (agreeing that such provisions "waive the employer's absolute right to demand an election; instead the employer must accept alternative methods of proving majority support"). The Court noted, however, that "[t]he specific non-election recognition procedures which the clauses permit is a matter for the parties

to consider in the first instance," and "express[ed] no opinion whether authorization cards [*i.e.*, cards that designate the union as the employee's bargaining agent] or other procedures may be utilized or objected to consistent with the[se] clauses." *Retail Clerks*, 510 F.2d at 806. On remand, the NLRB adopted the D.C. Circuit Court's interpretation, agreeing that such provisions are valid to the extent they operate as "contractual commitments by the Employer to forgo its right to resort to the use of the Board's election process in determining the Unions' representation status in . . . new stores." *Houston Div. of the Kroger Co.* (*Kroger II*), 219 N.L.R.B. 388, 389 (1975).

The Union argues that, in light of *Kroger I* and *Kroger II*, the Recognition Provision is ambiguous because it cannot mean what it literally says—*i.e.*, it purports to make the Union automatically the "sole and exclusive bargaining agent" for employees in newly-acquired stores, despite the requirement of some showing of majority support as a prerequisite for such status. Moreover, the argument continues, although the Recognition Provision operates as a waiver of Rite Aid's right to demand a Board-ordered election, neither the Recognition Provision nor any other provision of the CBA sets out the "specific non-election recognition procedures" by which the Union may show majority support in newly acquired stores, *Retail Clerks*, 510 F.2d at 806, including whether Union representatives may enter newly acquired stores for the purpose of obtaining such majority support.

Accordingly, the Union seeks the opportunity through arbitration to demonstrate, based on the parties' past practices and/or custom, that they understood the Recognition Provision

-34-

to grant the Union the right to enter newly acquired stores for the purpose of soliciting membership.[13] *See, e.g.*, *Consol. Rail Corp. v. Ry. Labor Executives' Ass'n*, 491 U.S. 299, 311 (1989) (explaining that "collective-bargaining agreements may include implied, as well as express, terms," and that "it is well established that the parties' practice, usage and custom [are] of significance in interpreting their agreement") (internal quotation marks omitted); *see also Warrior & Gulf*, 363 U.S. at 581–82 ("The labor arbitrator's source of law is not confined to the express provisions of the contract, as the industrial common law—the practices of the industry and the shop—is equally a part of the collective bargaining agreement although not expressed in it.").

Is the Union's position far-fetched? Hardly. For though the Majority dismisses that position as "unpersuasive," Maj. Op.

---

[13] The Majority dismisses the relevance of the *Kroger* decisions, reasoning that any "ambiguity in *Kroger* . . . does not translate to ambiguity in the instant CBA." Maj. Op. at 10. I believe my colleagues misperceive the Union's argument: it is not that *Kroger II* is ambiguous, but that it *results* in ambiguity in the CBA. Because Rite Aid has waived its right to require the Union to show majority support through an NLRB election, it must accept some alternative means by which the Union can make that showing. It is entirely possible that the parties resolved this issue by adopting a practice—even if it not explicitly memorialized in the CBA—of allowing Union representatives to enter Rite Aid stores for such purposes; *i.e.*, entering newly acquired stores to distribute authorization cards.

at 12, the Union has submitted an arbitration decision reaching in a similar case the very result it asks for, *see* 2005 AAA LEXIS 383 (2005) (Shaw, Arb.),[14] as well as a decision by the federal District Court for the District of Oregon enforcing a similar arbitration decision. *See Albertson's Inc. v. Local 555*, No. 97-977-JO, slip op. (D. Or. Mar. 16, 1998).[15] Both of these arbitrations concerned a grievance challenging an employer's refusal, purportedly pursuant to a non-solicitation policy, to permit union representatives to enter new stores to solicit membership. *See* 2005 AAA LEXIS 383, at *1; *Albertson's*,

---

[14] The docket number and the parties' names were redacted from the arbitrator's written opinion. Although not themselves in the record on appeal, in her opinion the arbitrator cited five additional arbitration decisions that apparently reached the same result. *Id.* at *23–24.

[15] The Majority seeks to distinguish this decision on the ground that the collective bargaining agreement at issue in *Albertson's*, unlike the Rite Aid CBA, included "a provision specifically providing for the applicability of the CBA to new stores." Maj. Op. at 11. However, the NLRB has ruled that the effect of a recognition provision worded similarly to the Rite Aid Recognition Provision is the same—it "purport[s] to add after-acquired stores to the existing [bargaining] units." *Kroger I*, 208 N.L.R.B. at 929 (considering recognition provision that provided that "[t]he Union shall be the sole and exclusive bargaining agent for all employees employed by the [employer] in stores operating in the state of Texas"). Hence, the differently worded recognition provision in *Albertson's* is not a basis for distinguishing that decision.

No. 97-977-JO, slip op. at 14–15. And in both the arbitrator—relying on the ambiguity in the parties' recognition provisions resulting from the *Kroger* decisions—determined that the parties' past practices demonstrated that they understood the bargaining agreement to grant the union the right to enter new stores to solicit membership. *See* 2005 AAA LEXIS 383, at *45–46; *Albertson's*, No. 97-977-JO, slip op. at 14. These decisions serve only to underscore that the Union's asserted right of store access is, at the least, "not so plainly unreasonable that [it] must be regarded as nonarbitrable because it can be seen in advance that no award to the Union could receive judicial sanction."[16] *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 555 (1964) (*citing Warrior & Gulf*, 363 U.S. at 582–83).

Moreover, the Union's grievances present at least as strong a case for arbitrability as the grievance in *E.M. Diagnostic*, where we relied on "implicit" limits on the company's explicit right to subcontract to conclude that the grievance was arbitrable. 812 F.2d at 96. Just as the company's subcontracting all work in the bargaining unit would have been "inconsistent with the [collective bargaining] agreement's

---

[16] The Majority finds it "rather curious" that the Union has "urg[ed] us to consider favorable . . . merits decisions as evidence of the dispute's arbitrability," given that the "merits and arbitrability questions are distinct." Maj. Op. at 10 n.5. In light of the District Court's and the Majority's conclusion that the merits and the question of arbitrability are "inextricably intertwined" in this case, I see nothing curious about the Union's submission of these decisions.

-37-

recognition of the Union as the bargaining agent for the Company's employees," *id.*, Rite Aid's refusal to allow Union representatives to enter newly acquired stores to solicit Union membership and distribute authorization cards—the obvious alternative to initiating an NLRB-directed election (the right to which Rite Aid has waived by virtue of *Kroger II*)—is inconsistent with the Recognition Provision. Indeed, it would be anomalous if Rite Aid could avoid the apparent intent of the Recognition Provision—*i.e.*, recognizing the Union as the bargaining agent for employees in newly acquired stores without requiring the parties to go through an NLRB-directed election—by preventing the Union from showing majority support through this alternative procedure.

In sum, I believe the Recognition Provision sufficiently demonstrates that the subject matter of the Union's grievances falls within the zone of interests that have received protection in the CBA,[17] and thus falls within the scope of the CBA's broad

_____

[17] Further supporting this conclusion is the fact that the CBA expressly provides that Union representatives may enter Rite Aid stores for at least one purpose: the Observation Provision authorizes Union representatives to enter Rite Aid stores "to satisfy themselves that [the CBA] is being observed." Regardless of the merits of the Union's position that this provision should be interpreted as authorizing it to enter newly acquired stores to solicit membership, the Observation Clause confirms that the *subject matter* of the Union's grievances—*i.e.*, the circumstances in which Union representatives may enter Rite Aid stores—falls within the "zone of interests" that have

arbitration clause. In seeking to compel arbitration, the Union is not attempting to enforce a right that is "wholly outside the scope of the CBA," Maj. Op. at 16, such as forcing Rite Aid to distribute Christmas Turkeys to its employees, *Boeing Co.*, 349 F.2d at 413. Rather, the Union seeks to enforce, by arbitrating the meaning of an ambiguous provision of the CBA, an asserted right that implicates a fundamental aspect of the parties' ongoing relationship under that agreement. With scant evidence of the parties' past practices, understandings, prior agreements, or bargaining history, we are ill-equipped to decide whose interpretation of the Recognition Provision is correct. Rather, that function is properly fulfilled by an arbitrator, as the parties

---

received protection in the CBA.

The Majority, like the District Court, concludes that the Observation Provision is irrelevant to the Union's grievances, as "[t]he CBA cannot apply to the newly-acquired stores or to their employees because the Union does not presently represent those stores' employees." Maj. Op. at 13. Of course, the Majority's conclusion only makes sense in light of *Kroger II*; when read literally, the Recognition Provision purports to do exactly that (*i.e.*, make the Union automatically the bargaining agent for employees in newly acquired stores). Thus, although the Majority concludes that the Recognition Provision is *not* ambiguous (in rejecting the Union's interpretation of that provision), it nonetheless relies on the *ambiguity* in the Recognition Provision that results from *Kroger II* in rejecting the Union's interpretation of the Observation Provision.

-39-

have agreed.[18]

---

[18] Because the Recognition Provision sufficiently demonstrates that the Union's grievances come within the "scope" of the CBA's arbitration provision, I need not address the Union's argument regarding the Privileges Provision. I note, however, that our decision in *United Steelworkers of America v. Rohm and Haas Co.*, 522 F.3d 324 (3d Cir. 2008)—on which Rite Aid relies almost exclusively in its brief—does not, as the Majority contends, broadly authorize courts to interpret substantive provisions of a collective bargaining agreement to determine whether they are "sufficiently implicated by a grievance that one party seeks to arbitrate." Maj. Op. at 14–15.

The collective bargaining agreement in *Rohm and Haas* contained an arbitration provision that, unlike the Rite Aid CBA's arbitration provision, applied only to specific subjects—*i.e.*, "[s]uch questions arising under [the] Agreement as involve wages . . . , individual base rates, hours of employment and working conditions." 522 F.3d at 328 (first alteration in original). After their claims for disability benefits under the parties' ERISA plan (which lacked an arbitration provision) were denied by the plan administrator, union employees sought to arbitrate those claims under the parties' collective bargaining agreement. In light of the arbitration provision's express subject matter limitations, we reasoned that, "[a]lthough . . . the . . . arbitration clause [was] broad, the underlying basis for the [union's] grievance . . . must still arise from some specific article" of the collective bargaining agreement. *Id.* at 332. Accordingly, we considered substantive

-40-

*Cf. United Steel Workers Int'l Union v. TriMas Corp.*, 531 F.3d

---

provisions of the collective bargaining agreement to determine whether, as the union argued, "disability benefits are considered 'working conditions'" [under the collective bargaining agreement]," and thus "within the range of arbitrable subject matter." *Id.* We concluded the answer was clearly no.

The Majority suggests that I dismiss *Rohm and Haas* (on which I was on the panel that decided it) without explaining why "we should not be bound by this very recent binding precedent." Maj. Op. at 15 n.7. I do not question the binding nature of *Rohm and Haas*, but conclude that it is simply not on point. In *Rohm and Haas*, it was obvious that the subject matter of the union's grievances—entitlement to disability benefits under a completely separate ERISA plan—fell wholly outside the scope of the collective bargaining agreement. ERISA benefits on their face simply are not "working conditions." To be sure of this, we considered the union's arguments that certain provisions of the bargaining agreement could be construed as referring to or incorporating the disability benefits provided for under the ERISA plan. In so doing, however, we did not broadly hold that "the merits may be considered when necessary to determine arbitrability." *Id.* Indeed, we had no reason to consider the merits of whether the employees were entitled to disability benefits under the ERISA plan, and did not, as the Majority does, rely on *Litton Financial Printing Division v. National Labor Relations Board*, 501 U.S. 190 (1991), to justify our analysis. Accordingly, I cannot agree that *Rohm and Haas* is the watershed decision my colleagues apparently believe it is.

-41-

531, 536 (7th Cir. 2008) ("If the parties have in fact agreed to arbitrate their dispute, then they have bargained for the *arbitrator's* interpretation of their contract—not ours. . . . If we were to weigh in on the merits of their case, we would be denying them the benefit of that bargain.") (emphasis in original) (internal citation omitted).

### 3. The Merits And The Issue Of Arbitrability Are Not "Inextricably Intertwined"

The Majority, like the District Court, also relies on *Litton Financial Printing Division v. National Labor Relations Board*, 501 U.S. 190 (1991), to justify its consideration of the merits of the Union's grievances. The Majority concludes that (1) *Litton* authorizes courts to consider the merits of grievances whenever "the merits and arbitrability questions are inextricably intertwined," Maj. Op. at 17; and (2) these questions are necessarily "intertwined" where a collective bargaining agreement "limit[s] the scope of arbitration to matters regarding the agreement or its construction," *id*. at 19. *Litton* does not support either of these conclusions.

In *Litton*, the Supreme Court considered the arbitrability of grievances filed on behalf of employees who were laid off almost one year after the parties' collective bargaining agreement had expired. To determine whether the grievances were arbitrable, the Court first sought to interpret its decision in *Nolde Brothers, Inc. v. Local No. 358, Bakery & Confectionary Workers Union*, 430 U.S. 243 (1977), which announced a presumption in favor of post-expiration arbitration unless "negated expressly or by clear implication," and held that, in

-42-

determining whether a post-expiration grievance is arbitrable, courts should determine whether the grievance "arises under" the expired agreement. *Id.* at 253, 255. The *Litton* Court explained that, to "arise under" an expired collective bargaining agreement, the grievance must "involve[] facts and occurrences that arose before expiration, where an action taken after expiration infringes a right that accrued or vested under the agreement, or . . . , under normal principles of contract interpretation, [involves] [a] disputed contractual right [that] survives expiration of the remainder of the agreement." *Litton*, 501 U.S. at 206. Applying this rule, the Court determined that the seniority rights the employees sought to enforce did not "arise" out of the expired collective bargaining agreement because "factors such as aptitude and ability"—on which application of the seniority provision was dependent—"do not remain constant, but change over time." *Id.* at 210 ("We cannot infer an intent on the part of the contracting parties to freeze any particular order of layoff or vest any contractual right as of the Agreement's expiration.").

The *Litton* Court acknowledged that, in determining that seniority rights did not "arise" under the expired agreement, it had (1) interpreted a substantive provision of the collective bargaining agreement (the seniority provision), and (2) necessarily reached the merits of the grievances. *See id.* at 208–09. The Court explained, however, that the presumption of arbitrability should not apply with its usual force in the context of post-expiration grievances:

> We acknowledge that where an effective bargaining agreement exists between the parties,

-43-

and the agreement contains a broad arbitration clause, "there is a presumption of arbitrability in the sense that '[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'" *But we refuse to apply that presumption wholesale in the context of an expired bargaining agreement, for to do so would make limitless the contractual obligation to arbitrate.* Although "[d]oubts should be resolved in favor of coverage," we must determine whether the parties agreed to arbitrate this dispute, and we cannot avoid that duty because it requires us to interpret a provision of a bargaining agreement.

*Id.* at 209 (*quoting AT&T Techs.*, 475 U.S. at 650) (emphasis added).

The Majority interprets *Litton* as follows: "Because the Agreement limited the scope of arbitration to matters regarding the agreement or its construction,[19] the Supreme Court in *Litton*

---

[19] The arbitration provision in the expired collective bargaining agreement at issue in *Litton* provided: "Differences that may arise between the parties hereto regarding this Agreement and any alleged violations of the Agreement, [and] the construction to be placed on any clause or clauses of the Agreement[,] shall be determined by arbitration . . . ." *Id.* at 194.

-44-

found it necessary to interpret the agreement in order to properly determine the question of arbitrability." Maj. Op. at 18–19. I believe this is incorrect. The *Litton* Court did not justify its consideration of the merits based on the language of the parties' arbitration provision, but rather on its concern that applying the presumption of arbitrability "*in the context of an expired bargaining agreement* . . . would make limitless the contractual obligation to arbitrate." *Litton*, 501 U.S. at 209 (emphasis added). Indeed, in refusing to apply the presumption of arbitrability "wholesale" in this context, *id.*, the Court seems to have assumed that applying the presumption with its normal force would have *required* arbitration (in light of the collective bargaining agreement's broad arbitration provision).

To support its reading of *Litton*, the Majority relies on two decisions from our sister circuits applying *Litton* outside the context of post-expiration grievances. However, these cases involved a similarly narrow issue: whether grievances brought on behalf of individuals who had either been elevated to supervisory positions, or had retired, were covered under bargaining agreements that applied only to "employees." *See Int'l Bhd. of Elec. Workers, Local 1 v. GKN Aerospace N.A., Inc.*, 431 F.3d 624, 629 (8th Cir. 2005) (where arbitration provision applied only to grievances submitted by "employees," supervisor's grievance was not arbitrable because "a plain reading" of the collective bargaining agreement did "not permit the possible inference that [the supervisor] ha[d] a right to return to the bargaining unit"); *Indep. Lift Truck Builders Union v. Hyster Co.*, 2 F.3d 233, 235–36 (7th Cir. 1993) (district court erred in compelling arbitration of retired employee's grievance without deciding whether "the collective bargaining agreement

-45-

covers retired employees," because, in so doing, the court had "order[ed] the dispute to arbitration without first determining that it was arbitrable"); *see also United Steelworkers of Am., Local No. 1617 v. Gen. Fireproofing Co.*, 464 F.2d 726, 729 (6th Cir. 1972) (holding, pre-*Litton*, that supervisor's grievance was not arbitrable because the "plain meaning" of the collective bargaining agreement's arbitration provision was "that the Company has agreed to process any and all disputes involving its 'employees' through the grievance procedures (including arbitration), but that disputes concerning supervisory personnel are not included").[20]

In this context, these courts reasoned that the merits of the grievances and the question of arbitrability were "intertwined," *GKN Aerospace*, 431 F.3d at 627, or "collaps[ed] into the same inquiry," *Hyster*, 2 F.3d at 235,

---

[20] Although cited by the Majority, the First Circuit Court's decision in *Peerless Pressed Metal Corporation v. International Union of Electrical, Radio and Machine Workers*, 451 F.2d 19 (1st Cir. 1971)—issued two decades before the Supreme Court's decision in *Litton*—does not support the Majority's analysis. Indeed, in concluding that grievances lodged by a supervisor were arbitrable—even though the argument that supervisors were covered under the collective bargaining agreement was "weak" (but not "impossible"), *id.* at 21—*Peerless* cautioned that courts may not "inquire into the merits on the theory that they are enforcing a clause limiting arbitration to disputes requiring an interpretation of the agreement." *Id.* at 20.

-46-

because, in determining that the grieving employee was not covered by the collective bargaining agreement, the court was necessarily determining that the employee was not entitled to relief under that agreement. For example, in *Hyster* the Seventh Circuit Court reasoned that three questions—"whether the Union has standing to file a grievance on behalf of retired employees, whether the grievance is arbitrable, and whether the grievance has merit—all collapse[d] into the same inquiry: whether the collective bargaining agreement covers retired employees." 2 F.3d at 235.

The *GKN Aerospace* and *Hyster* Courts were thus presented with the threshold issue of whether the individuals attempting to arbitrate a grievance under the collective bargaining agreement's grievance procedure were authorized to do so—or, using the language of *E.M. Diagnostic*, whether the interests these individuals sought to enforce came within the "zone of interests" protected under the agreement. This issue went directly to the jurisdiction of the arbitrator to hear the grievance in the first place. *Cf. Terre Haute Newspaper Guild, Local No. 46 v. Thomson Newspapers, Inc.*, 68 F. Supp. 2d 1028, 1033, 1037 (S.D. Ind. 1999) (discussing *Litton* and *Hyster*, and reasoning that "it is the Court's responsibility to determine whether the . . . employees may be covered [under the collective bargaining agreement] before it can send the question to the arbitrator"). Stated another way, these Courts believed they were required to determine, as a threshold matter, whether the employees were authorized to bring grievances under the respective collective bargaining agreement regardless of whether, had they been so authorized, those grievances would have been meritorious.

-47-

In our case, the merits of the Union's grievances and the issue of arbitrability are not "intertwined" in a similar sense: it is undisputed that the CBA remains in force and that the Union is authorized to bring grievances under it. At bottom, the Majority's conclusion that the merits and the issue of arbitrability are "inextricably intertwined" reduces to the conclusion that the Union's grievances do not *actually* "involve the interpretation" of the CBA *because* they are not meritorious. As I have explained, the *Steelworkers* principles prohibit this line of inquiry, and I cannot discern from *Litton* any intention on the part of the Supreme Court to jettison those principles in all contexts.[21]

> B. The Union's Dispute Is Not Expressly Excluded From Arbitration, And There Is No "Forceful Evidence" Of An Intention To The Contrary

---

[21] The Majority's reliance on *Litton* is ironic, given the lengths our Court has gone to avoid reaching the merits even in the context of grievances arising under expired collective bargaining agreements. *See Luden's Inc. v. Local Union No. 6 of the Bakery Workers' Int'l Union of Am.*, 28 F.3d 347, 354 (3d Cir. 1993) (declining to answer whether *Litton* "impliedly overruled the portion of *Nolde* holding that a court answering the arbitrability question is not to look to the merits of the underlying claim," and instead holding that the duty to arbitrate arose as a term of an implied-in-fact collective bargaining agreement after the prior agreement had lapsed).

Because the Union's grievances come within the scope of the CBA's arbitration provision, I conclude that we are required to compel arbitration. It is undisputed that the CBA's arbitration provision is broad, and that the presumption of arbitrability applies. Accordingly, the Union's dispute is arbitrable unless (1) the CBA contains an "express provision excluding it" from arbitration, or (2) Rite Aid (the party opposing arbitration) produces "the most forceful evidence" to this effect from the bargaining history. *AT&T Techs.*, 475 U.S. at 650 (*quoting Warrior & Gulf*, 363 U.S. at 584–85).

Neither is true here: (1) the CBA contains no arbitration exclusion for disputes over the circumstances in which Union representatives may enter Rite Aid stores,[22] and (2) Rite Aid has submitted no "forceful evidence" from the parties' bargaining history suggesting an intention to exclude such disputes from arbitration.[23] Thus, we must order the parties to arbitrate the

[22] The CBA expressly excludes only one topic from the grievance procedure: an alleged breach of the no-strike clause.

[23] The Majority appears to suggest that such "forceful evidence" exists because the CBA includes other provisions addressing new stores—*i.e.*, a provision recognizing Rite Aid's right to "open new establishments of any kind," and requiring Rite Aid to "notify the Union of any new store openings or acquisitions within" the counties covered by the CBA. Because these provisions confirm that the parties bargained with respect to Rite Aid's right to open new stores, the Majority concludes that "[i]f the parties had intended a right of access to be encompassed by the CBA's arbitration clause, it surely would

grievances even if the Union's interpretations of the Recognition, Observation, and/or Privileges Provisions are

have appeared in the CBA."  Maj. Op. at 17 n.8.

This observation might be relevant to the merits of the Union's underlying grievances, but it reveals nothing about the parties' intent to exclude from arbitration disputes over the circumstances in which Union representatives may enter new Rite Aid stores.  Indeed, we rejected a similar argument in *E.M. Diagnostic*, where the employer argued that the union's subcontracting grievance was not arbitrable based on evidence from the bargaining history that (1) although "the Union sought to negotiate a specific limitation on the Company's right to subcontract work," the executed bargaining agreement contained no such provision, and (2) a union representative had acknowledged the employer's unfettered right to subcontract during negotiations.  812 F.2d at 97 ("However relevant [those facts] might be to the merits of the Company's case on the subcontracting issue, it does not enlighten us on whether the parties agreed to limit the arbitration clause of the agreement to less than its apparent scope."); *accord Lukens Steel Co. v. United Steelworkers of Am.*, 989 F.2d 668, 674 (3d Cir. 1993) (grievance regarding the timing of recall of employees following a strike was arbitrable, despite evidence from the parties' bargaining history that the timing issue was "left outside the contract [subject] to [the employer's] unilateral determination," because "even if the parties agreed that [the employer] had the right to set the timing of the recall, it would not necessarily follow that disputes over the timing of the recall were not arbitrable").

"frivolous," as engaging in a substantive interpretation of these provisions would involve an impermissible review of the merits.[24]

* * * * *

"Decisions on the merits, whether easy or difficult, must be left to the arbitrator." *E.M. Diagnostic*, 812 F.2d at 97. The Majority essentially concludes that the merits question of whether the Union has a right of store access to solicit membership is so "easy" to answer that arbitration is not called for. Although the Majority reaches this conclusion under the guise of enforcing the parties' agreement to arbitrate only those disputes that "involve the interpretation" of the CBA, it conflates that question with whether the Union's interpretation of the CBA is correct. In my view, such analysis veers impermissibly into the merits of the underlying grievances, and fails to heed the Supreme Court's warning that courts not "become entangled in the construction of the substantive

_____

[24] The Majority suggests that the CBA's arbitration provision *itself* constitutes "forceful evidence" that the parties "intended to exclude from arbitration claims which arise wholly outside the scope of the CBA." Maj. Op. at 16. I do not believe such a conclusion follows under the *Steelworkers* principles—*i.e.*, those principles do not contemplate that a court may substitute its own interpretations of substantive provisions of a bargaining agreement for "forceful evidence" from the bargaining history of an intention to exclude a dispute from arbitration.

provisions of a labor agreement, even through the back door of interpreting the arbitration clause." *Warrior & Gulf*, 363 U.S. at 585.

I fear the Majority's holding will significantly undercut the force of the presumption of arbitrability in cases involving similar arbitration provisions. In such cases, courts in our Circuit will presumably conclude that they may examine the merits of every grievance and, upon determining that the arbitration proponent's interpretation of the bargaining agreement is not sufficiently "plausible," refuse to compel arbitration. I do not believe the *Steelworkers* Courts envisioned such a screening role for courts, nor do I believe the *Litton* Court intended to announce an exception to the presumption of arbitrability that would effectively swallow the presumption itself.

For these reasons, I respectfully dissent.